IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

SOUTH SHORE HELLENIC CHURCH, INC.,

    Plaintiff,

v.

ARTECH CHURCH INTERIORS, INC., and,

WILLIAM BURNS, individually,
and as President, Artech Church Interiors, Inc.

    Defendants
_____

CIVIL ACTION NO.
1:12-cv-11663

## **COMPLAINT**

   Plaintiff South Shore Hellenic Church, Inc. brings this action for legal relief under the common law and statutes of the Commonwealth of Massachusetts, against Artech Church Interiors, Inc. and its President, William Burns, for breach of contract (construction repair and restoration), breach of unqualified express 1-year guarantee, breach of implied warranty to do a workmanlike job, negligent construction and defective workmanship, breach of implied covenant of good faith and fair dealing, and unfair trade practices under Mass. Gen. L. ch. 93A, §§ 2 and 9.

## JURISDICTION

1.     This Court has jurisdiction under 28 U.S.C. § 1332, based upon diversity of citizenship.   The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

## VENUE

2.     Venue is proper in this Court based upon 28 U.S.C. § 1391 and in that a substantial part of the events or omissions giving rise to the claims occurred in this district as alleged below.   In addition under M.G.L. c. 223A, § 3, the Defendants have purposefully availed themselves of the privilege of conducting activities within the Commonwealth of Massachusetts, thus invoking the benefits and protections of its laws, and the causes of action arise out of the Defendants transaction of business, acts or omissions in the Commonwealth.

## PARTIES

3.     The Plaintiff, South Shore Hellenic Church, Inc. (a/k/a the Nativity-Assumption of the Virgin Mary Greek Orthodox Church, hereinafter "Panagia"), is a religious corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at 811 Jerusalem Road, Cohasset, Massachusetts 02025.

4.     Upon information and belief the Defendant, Artech Church Interiors, Inc. (hereinafter "ARTECH"), is a corporation organized and existing under the laws of the State of Connecticut, having its principal office at 1 Reserve

2

Road, Danbury, Connecticut 06810, and formerly located at 12 Mill Pond Road, Ste. 8, Danbury, Connecticut 06810 at relevant times.   ARTECH does not maintain a place of business or keep assets in the Commonwealth of Massachusetts.  ARTECH is hereby sued for damages and other relief.

5.   Upon information and belief the Defendant, William Burns (hereinafter "BURNS"), is the President of ARTECH at relevant times, and is resident of 59 Sleepy Hollow Drive, Danbury, Connecticut 06810.  BURNS does not maintain a place of business or keep assets in the Commonwealth of Massachusetts.   BURNS was acting in the course and scope of his official capacity as a corporate officer and representative of ARTECH at all relevant times.  BURNS is hereby sued in his official, individual and personal capacity for damages and other relief.

## BACKGROUND

6.   Colonel Albert A. Pope was a decorated Union Army veteran of the American civil war, and hailed a titan of American industry as the pioneer bicycle manufacturer (under the Columbia label) and a leading automaker in the late 1800's.  As a Gilded Age tycoon, Col. Pope took a backseat to no one in his charitable contributions, which were many and varied.  As the father of the Good Roads Movement, no one individual can be given more credit in paving the way for a network of good roads in the United States, both locally and nationally, than Col. Pope.  N.Y. Times, August 11, 1909.

7.      Perhaps Col. Pope's most poignant charitable contribution was the graceful stone church at 811 Jerusalem Road, Cohasset, Massachusetts (hereinafter the "Church"), built together with his wife, Abigail Linder Pope, as a tribute to their son, Charles, who died suddenly and unexpectedly at the age of sixteen years.  The facts and circumstances surrounding the origins of the Church are well described by present-day historian and author Stephen B. Goddard, in his biography of Col. Pope.   See, S. B. Goddard, Colonel Albert Pope and His American Dream Machines:  The Life and Times of a Bicycle Tycoon Turned Automotive Pioneer, at 149 (2000).

> Elizabeth Bogman Pope's strong determination that her husband, Charles, would not live upon the sea was insufficient to protect their progeny from Neptune's wrath.  It is difficult to be raised within sight of water and not be drawn to it, if not for a livelihood then for recreation.  Albert Linder Pope had given his heart to sailing early on, so it was natural that the Colonel's other children would follow suit, including Charles, his fifth-born.  In 1898, at age sixteen, the second-youngest child was sailing off the coast when, in an accident whose details are uncertain, he drowned.  Albert and Abbey were devastated at the premature loss of another child; Mary had died many years earlier, in infancy.  And while few families escaped a visit from the undertaker in a day when medical care was primitive, nothing grieves a parent more than the death of a child.

> The Pope's response was to find something positive in the event by constructing a small stone church, with bell tower and rose window, on Jerusalem Road in Cohasset, beside the marshes that led to the ocean that claimed their son.  The Pope Memorial Church, dedicated in July 1900, is revealing of Albert's and Abby's philosophy of life.  Presented for use of the people of Cohasset, it expressly disavowed any particular creed or religion.  Engraved on the exterior wall of its double-arched entry are the words "Love to God and love to man."  Anyone with a religious belief, whatever it might be, was welcome.

8.     The Pope Memorial Church building was erected in 1900 from $300,000 in funds given by Col. and Mrs. Pope.   (Exhibit No. 2) (present-day estimate of approximately $8.3mm using increase in Consumer Price Index).   The Church was designed in the Richardsonian Romanesque architectural style by Boston architect Frederic R. Pope, a cousin of Col. Pope.   Frederic Pope is credited with designing forty-four (44) townhouse residences and apartment buildings in the Back Bay area of Boston, Massachusetts, including one 12-story apartment building and the Copley Square Hotel, the city's second-oldest hotel in continuous operation.  B. D. Epperson,  Peddling Bicycles to America: The Rise of an Industry, at 19 – 20 (2010).  At the time the Copley Square Hotel opened on July 4, 1891, it was one of the finest first-class hotels in the city, and the total cost to open the hotel was $300,000.   Wikipedia, Copley Square Hotel.   Apparently, no expense was spared on the construction of the Pope Memorial Church less than a decade later, as the same $300,000 amount was expended on the approximately 5,000 square foot, single-story structure with bell-tower.  (Exhibit No. 2, supra).

9.     The Pope Memorial Church was instituted as a non-denominational chapel.  By the early 1920's, it became part of the Methodist Church of the New England Southern Conference.   In 1980, the Pope Memorial Church was purchased by the Plaintiff, South Shore Hellenic Church, Inc., and was thereafter re-dedicated as the Nativity-Assumption of the Virgin Mary Greek Orthodox Church (hereinafter "Panagia"), and became part of the Greek Orthodox Metropolis of Boston.  (Exhibit No. 2, supra).

5

10.     By way of providing general background information regarding masonry construction, an article entitled "Guidelines for Masonry" was prepared to assist laymen property owners with information when considering the repair, alteration or installation of masonry.  (Exhibit No. 3).  This report was prepared in 2005 by Dominique M. Hawkins, AIA, of Preservation Design Partnership in Philadelphia, PA, on behalf of the Town of Riverhead, NY and funded by the New York Department of State.  In short, it provides a basic introduction to the topic and teaches construction laypersons the following helpful points:

- Functionally, historic masonry can act as the principal load bearing system for the building as well as its skin, shedding water and deflecting sunlight and wind.  Id. at 1.

- Once water is permitted to penetrate a masonry wall, the deterioration will accelerate very quickly, becoming more severe and costly.  Id. at 3.

- Before attempting to repair masonry problems, it is strongly recommended that the cause of the problem be addressed.  This would include repairing any outstanding exterior maintenance and drainage issues.  Id.

- Repointing is the process of removing deteriorated/failed mortar from joints in a masonry wall and replacing it with new mortar.  Id. at 5.

- If properly completed, repointing work can last on average about 50 to 100 years, however, it can be time consuming and expensive.  Id.

## STATEMENT OF FACTS

11.    Upon information and belief, by early 2009 the 109 year-old Church had developed water leaks, which allowed outside water to migrate through its exterior building envelope and damage the interior.  The water damage to the interior ceiling and walls included visible water stains, discoloration, cracks, calcification, peeling and delamination of the lath and painted plaster surfaces.

12.    Upon information and belief, in the spring of 2009 the Panagia Board of Stewards (hereinafter the "Board") decided to fully restore the Church's water damaged interior, and repair its exterior building envelope so as to eliminate the outside water leaks.  The Board recognized the advantages of hiring a design-builder for the renovation project, including the time and cost savings inherent in the process and the single point responsibility for any potential design and construction, delays, and defects.   The Board also recognized the disadvantage that, without an independent design professional looking over the design-builder's shoulder, it was inherently less assured of construction quality. Engaging a design-builder therefore required the Board to place a great deal of faith in the design-builder to self-police its work and the work of its subcontractors to meet stated performance requirements and honor any warranties.

13.    Upon information and belief, in the spring of 2009 at the direction of the Board, Mr. Edwin R. Lofgren (hereinafter "Lofgren"), then the President of

the Board, and Mr. Peter Bourikas (hereinafter "Bourikas"), then Chair of the
Board's Building Committee, interviewed prospective design-build contractors on
its behalf.  Having narrowed the field to a few professional church restoration
companies, including the Defendant ARTECH, Lofgren and Bourikas invited
these prospective contractors to perform on-site evaluations of the Church.
BURNS, together with Michael Cave (hereinafter "CAVE") conducted the site
evaluation of the Church on behalf of ARTECH.  During the course of this
evaluation, CAVE ascended the Church to evaluate the roof and bell-tower.
Thereafter, ARTECH provided detailed project specifications, restoration and
repair estimates based upon their on-site evaluations of the Church and Lofgren
and Bourikas' general statement of Panagia's exterior repair, interior restoration
and building envelope performance needs (i.e., eliminate outside water leaks).

14.    In a letter dated May 1, 2009, BURNS provided Lofgren
ARTECH's quotation for the construction restoration and repair work to be done
at the Church.  (Exhibit No. 4).  The quotation includes five separate paragraphs
of construction specifications, each related to a particular general construction
task.  In turn, these general specification paragraphs further include individual
line-items, each related to a detailed, specific construction task.  Paragraph four
(4) entitled "Narthex" (a/k/a, Foyer), included line-item seven (7) which states
"All areas in the exterior front wall will be cleaned out and have old loose or
missing mortar replaced."  Absent from the quotation is any mention of "exterior
waterproofing."  The total cost, labor and material for the entire quotation
amounts to $111,805.00.

8

15.   Along the bottom of each page of ARTECH's quotation appears the following statement:  "Visit our website at www.ArtechChurchInteriors.com to see photos of our work".   A computer screen shot of www.ArtechChurchInteriors.com homepage (Exhibit No. 5) taken by Lofgren on May 19, 2009 includes the following statements:

- Artech Church Interiors in **Danbury, CT** is a third generation church renovation company with over 45 years of personal experience working on over 4,000 churches.

- Artech Church interiors brings to every job the skill and dedication of master craftsmen who only specialize in churches and synagogues to make every project a success.  We pride ourselves on having delivered the same quality of work to the small churches, with only a few dozen members, to some of the largest and oldest churches in the area.  **The owners, bothers Tom and Bill, will work with you personally to make sure the job is done right and you receive the service you deserve**.  (emphasis added).

- We are equipped to handle *every* aspect of a church restoration or renovation project.  We offer many different options in both interior and exterior church renovations.   **Our church interior services include:** interior or liturgical design, **interior church painting and plaster repair,** pew refinishing, loose reversible pew cushions, re-upholstering old pews, new church pews, theater seating, chairs, kneelers, lighting, carpeting and flooring, audio/video systems and more.   **Our church exterior services include:** exterior church painting and renovation, church roofs and steeples, window frame restoration, brick and **stone repointing and waterproofing.**  We have many options available, and **one of our owners will work with you to create a distinctive one-of-a-kind masterpiece**.   (emphasis edited and added).

16.   Upon information and belief, Lofgren greatly relied on the truth and accuracy of both these written representations and BURN's oral assurances of ARTECH's qualifications - especially regarding the construction restoration and repair of churches.  As a result, he reasonably believed in ARTECH's ability to

accommodate Panagia's stated needs and successfully repair and restore both the exterior building envelope and the water damaged interior of the Church.

17.    On May 31, 2009, the General Assembly of the Stewards of the Panagia Parish convened and authorized the expenditure $140,000.00 for construction repairs and restoration.  The General Assembly also authorized a fundraising campaign to raise the necessary capital funds.  In support thereof, the Board of Stewards shortly thereafter published its first fundraising brochure.  (Exhibit No. 6).  Amongst a litany of urgent building repairs and restoration needs it noted the following:

- There are also weather related crevices that have developed in the exterior stonework, leading to leaks and water damage to the interior.

- In the interior, water damage has led to calcified plaster which is falling into our church interior, in the Narthex and the sanctuary.

- Mr. Bourikas, as Chair of our Building Committee, has interviewed quite a few prospective contractors for the repairs & restoration work, received a number of estimates, all within the allotted budget, and this field has been narrowed down to a few professional church restoration companies.

18.    In letter dated June 18, 2009, BURNS provided Lofgren ARTECH's 5th revised quotation for the construction restoration and repair work to be done at the Church.  (Exhibit No. 7).  The Grand Total for the entire quotation was stated as $116,625.00, to which was subtracted a $4,600.00 "Discount if all work above is done at the same time," resulting in an Adjusted Total, after discount of $112,025.00.  As with the preceding versions, this quotation was provided already executed by BURNS as ARTECH's official

signatory.   CAVE was designated therein as ARTECH's Project Manager.   As with the preceding versions of the quotation, appearing at the end of the Contract is the following statement:

> The above work to be executed by qualified craftsmen properly covered with workmen's compensation, property damage, and general liability insurance.  Proof of insurance will be provided upon request.
>
> Artech Church Interiors guarantees all workmanship for a period of one year from the date of project completion.  Manufacturer's warranties apply for materials used.

19.     ARTECH's 5th revision quotation included the addition of an entirely new paragraph seven (7) entitled "Exterior Waterproofing," which further included four (4) line-items as follows:

1.  Sixty foot boom and scaffolding will be used.

2.  Exterior will be power washed

3.  All loose and missing mortar joints will be repointed.

4.  All stone work will be coated with **Compro[co]** Shield MX oil base waterproof sealer.

20.     Conpro Shield MX is a high performance, clear water repellant, silicone sealer.  (Exhibit No. 8).  According to the Manufacturer's (Conproco Corporation) Specifications, Conpro Shield MX's is designed for use on natural stone substrate.  The manufacturer claims it "Increases durability: Repels water from penetrating substrate.  Most damage to concrete, masonry and stone is due to water entry."  The manufacturer's requirements for application of Conpro Shield MX specify that "[I]nstallation shall be performed strictly in accordance with

manufacturer's current product data bulletin," which in turn states the following under the heading entitled "Surface Preparation":

- Substrate must be clean and free of loose debris, oils, paints, previously applied water repellants or any substrate that can interfere with penetration.

- Repoint loose deteriorating mortar; **fill all voids and cracks in mortar**. [emphasis added]

- Inspect flashing around all openings, caulking, expansion joints and roof components to determine condition and for evidence of water entry.  Material will not prevent water entry through cracks or voids in substrate or other building components.

The manufacturer's express limitations are that the sealer "[d]oes not prevent water entry through cracks, penetrations or open joints."

21.     On or about June 22, 2009, Lofgren executed ARTECH's 5th revised quotation on behalf of Panagia as its official signatory.  (Exhibit No. 9) (hereinafter the "Contract").   Panagia thereby contracted with ARTECH to completely restore the interior damage caused by exterior water intrusion and waterproof the exterior to prevent the reoccurrence thereof at the Church. Thereafter, Lofgren mailed the executed copy of the Contract and enclosed a check no. 135 in the amount $35,000.00, in full compliance with one of the Contract's stated payment terms "1/3 Deposit with signed contract".  (Exhibit No. 10).

22.     Shortly thereafter, the Board of Stewards published another fundraising brochure announcing the Contract with ARTECH, and its

commencement of the restoration and repair of the Church.  (Exhibit No. 11).  A bullet-point description entitled "OUR PROJECT"  included some of the following points:

*OUTSIDE:*

- Repoint stone as necessary.  Seal entirety.

*INSIDE:*

- Narthex – repair plaster, clean and paint, clean and poly wainscoting.

- Sanctuary – Clean entirety.  Repair plaster.  Paint entirety inc. altar and bathroom.

23.     Upon information and belief, ARTECH timely began restoring and repairing the Church in accordance with the "Scheduling" provision of the Contract, which specified the following:

- 6 WEEKS FOR COMPLETE RESTORATION to commence in the 2nd week of July '09

- Complete by September 8th or sooner with signed contract received by June 19, 2009.

- Church will be cleaned for services every weekend and funerals, as needed.

24.     Upon information and belief, a major part of the renovation project was to make the Church "tight" on the exterior to prevent the recurrence of any future outside water leaks that had severely damaged the Church interior.  Panagia insisted ARTECH carefully check out the Church's exterior and find the sources of any outside water leaks prior to commencing any interior restoration or repair work.  It especially insisted that the exterior of the Narthex be examined and

made "tight" prior to the interior restoration work since this was an area where the Church had significant water intrusion that had devastated the interior.  CAVE informed Panagia he had made the Narthex "tight" and took care of any outside water leaks by some minor roof and stonework repairs, which primarily consisted of screwing down the loose access hatch to the bell-tower, located above the Narthex.

25.     Upon information and belief, ARTECH's construction restoration and repair work proceeded throughout the summer of 2009, and the project was timely substantially completed by September 8, 2009, the day on which Greek Orthodox Christians celebrate the Nativity of the Virgin Mary, and coincidently also the Church's nameday.

26.     On Saturday, September 10, 2009, Panagia held at the newly renovated Church a memorial service entitled "Colonel Albert A. Pope Centennial Memorial Service," commemorating the 100th anniversary of the passing away of the Church's primary benefactor on August 10, 1909.  (See, Exhibit No.1, supra). The general public was cordially invited to this ecumenical memorial service, and in attendance were members of the Pope family and clergy of Cohasset.  The memorial service included a brief historical speech about Col. Pope by his descendant, Albert A. Pope IV, ecumenical prayers by the guest clergy of Cohasset, an Orthodox Christian memorial service, and the collective singing of non-denominational hymns by all those gathered.

27.     Upon information and belief, the Col. Pope memorial service was very well attended despite inclement weather which had forced cancellation of outdoor events.  The Church pews were filled to capacity during the service, with a standing-room only congregation.   Throughout the day, frequent favorable mention was made by both the guest clergy and the congregants in attendance regarding the exquisite overall appearance of the newly renovated Church.  The construction restoration and repairs were universally acclaimed as a success by those in attendance, which included both BURNS and CAVE.

28.     On or about September 29, 2009, Bourikas had completed his inspection of ARTECH's workmanship from the ground level, and provided ARTECH with a "punchlist" of twenty (20) outstanding incomplete or unsatisfactory restoration and repair items that remained.  (Exhibit No. 12).

29.     Upon information and belief, shortly thereafter, CAVE joined Bourikas for a "walk around" site inspection of the Church to review the punchlist together.   By October 6, 2009, ARTECH had addressed the "punchlist" to Panagia's satisfaction, and Panagia issued it a check no. 106 in the amount of $15,405.00 representing payment in full of the stated $112,025.00 Contract price by Panagia.   (Exhibit No. 13).  This date marked the final completion of the repair and restoration of the Church, and the commencement of the Contract's 1-year express guarantee period.

30.     Upon information and belief, less than five months later, on or about February 24, 2010, the Church's exterior building envelope had once again

developed water leaks.   This resulted in water damage to its interior finishes including two separate locations within the Church:  (1) in and around the ceiling and walls of the Narthex recently repaired by ARTECH, and (2) in the apse above the altar to a painted mural of "Christ Almighty" which had never previously suffered water damage.   Shortly thereafter, Panagia contacted its insurer, Church Mutual Insurance Company, and submitted a claim for the property damage.

31.     On March 30, 2010, Andrew W. Bird (hereinafter "Bird"), Insurance Claims Adjuisters, inspected the water damage to the Church on behalf of its insurer, and produced a photographic report dated the following day, March 31, 2010.   (Exhibit No. 14).   Bird's documented observations included the following:

- Right Slope.  Right slope of main church, lifted shingles not resealed. Roof area above altar.

- Bell tower.  Overview.  No damage observed.  Roof above Narthex. Wind blown water possibly entered through the vent and or the hatch door.

- Exterior entry.  Water leaking through stones.

- Narthex.  Water Damage to ceiling.

- Narthex.  Water damage to wall.  Moisture meter is pegged.

- Sanctuary.  Water damage to wall.

- Altar mural.  Water damage to mural and wall.

- Altar area.  Water damage to wall.  Moisture meter is pegged.

32.     Upon information and belief, shortly thereafter, in the spring of 2010, Lofgren informed CAVE that new water stains and plaster failure had developed in the areas where ARTECH had previously restored the Church's interior.  CAVE subsequently visited the Church site and examined the interior water damage, and thereafter promised Lofgren to repair (at no charge to Panagia) both the unsatisfactory interior condition and what he identified as the cause of the outside water leak.  Over the course of the following several months, CAVE cordially and continually assured Lofgren he would plug the outside water leaks, repair the Church's external building envelope, and restore its damaged interior. September 2010, CAVE failed to take any remedial action despite his initial promise and subsequent repeated assurances to Lofgren.

33.     Upon information and belief, Lofgren eventually became exasperated with CAVE's broken promises and lack of performance, so he finally requested third-party assistance from Michael G. Foley (hereinafter "Foley"), a general carpentry tradesman and principal of M. G. Foley Construction.  On or about September 14, 2010, Foley inspected elevated areas of the exterior of the Church which were normally not visible from ground level and accessible only by means of a thirty (30) foot long extension ladder.   Accordingly, Panagia's representatives, Bourikas (who suffers from vertigo) and Lofgren (who suffers from leg injuries), had not previously viewed these areas (dangerously inaccessible to nonprofessionals without proper experience and safety equipment) as part of their acceptance inspection of ARTECH's repairs the previous fall. Panagia therefore relied on ARTECH's representations at the time that all "loose

and missing" was repointed, there were no remaining mortar defects, and that the exterior building envelope was "tight."   Upon inspection Foley discovered numerous mortar defects consisting of cracked, loose and missing mortar in the joints between the exterior granite stonework.  Whatever various joint repairs had been made over a long period of years appeared to be poorly made, and employed the incompatible use of irregular, non-conforming mortars, roofing cement, and various urethane sealants.  The sheer extent and seriousness of the mortar defects were overwhelming, and it was readily apparent that little, if any mortar repairs at all were in fact executed in these normally hidden areas during the prior year's renovation by ARTECH.

34.     On September 20, 2010, Lofgren contacted BURNS directly via electronic mail and voicemail, and expressed the following:

> Would like to chat with you concerning some problems we have encountered with the recent restoration work at the church.  Have been dealing with Mike Cave on these issues, but we feel we are not getting the response we need, and certainly not proceeding on a timely basis.  (Exhibit No. 15).

35.     Upon information and belief, later that day, BURNS telephoned Lofgren back and together they discussed the Narthex/bell-tower problems – roof flashing and stonework.  BURNS requested Lofgren to send him photographs of the defects, and Lofgren invited him to look at the Narthex/bell-tower area in person.  (Exhibit No. 16).

36.     In a transmittal letter dated the following day, September 21, 2010, Lofgren wrote BURNS as a follow-up to their telephone conversation the preceding day and enclosed photographs "that illustrate the exterior problems" as BURNS had requested.   (Exhibit No. 17).   Therein Lofgren expressed his disappointing attempts to work with CAVE over the preceding months as follows:

> As explained in our conversation, I have been working with Mike Cave in an effort to deal with our water intrusion problems which have devastated the Narthex area of the church interior after all the work ARTECH did to restore our church inside & out. …
>
> A major part of the renovation project was to make the church "tight" on the exterior to avoid the water intrusion that had severely damaged the church interior.  This was not done or at least, not properly done.  We especially asked that the exterior of the Narthex be examined and made "tight" prior to the interior restoration work since this was an area where the Church had significant water intrusion that had devastated the interior. We subsequently have found that this did not happen, that we have both roof flashing and stone joint leaks which have allowed water intrusion and, once again, devast[at]ed the interior of the Narthex room.

37.     In an electronic mail dated October 4, 2010, BURNS accepted Lofgren's invitation to inspect the Church, and arranged to visit the Church on October 6, 2010, "between 3-4pm."  (Exhibit No. 18).

38.     Upon information and belief, BURNS kept his appointment and inspected the Church, after which he orally promised Lofgren to find the source of the water leaks and plug them, and admitted that ARTECH should have done this prior to interior restoration.  BURNS also orally promised Lofgren to repair the Narthex area at no charge to the Panagia.

39.     After approximately one month's time, in an electronic mail dated November 1, 2010 (Exhibit No. 19), Lofgren wrote BURNS a follow-up message to their last meeting, stating in pertinent part:

> Bill: haven['']t heard from you or Mike (Cave) as to when the masonry work can be completed, and it is rapidly becoming a weather issue.  If it's going to be below freezing at night, I don't see how we get cement to cure properly, do you?  If we can't do the masonry work on the roof, we can't button up the building to do the work in the interior above the altar.
>
> You should know that there are glaring gaps in the masonry all over the building, and it['']s clear that the contract was not honored.  You saw the pictures of some of it. …
>
> What are you willing to do to get these wrongs righted a.s.a.p. ???? May I hear from you right away on this???  Thank you, Ed Lofgren.

40.     Later that day BURNS wrote Lofgren a brief response stating "Ed, Mike Cave will be at the church Saturday morning to complete the masonry work.  He will call you tomorrow to confirm the time.  Sorry for the delay.   Bill". (Exhibit No. 19, supra).

41.     Upon information and belief, CAVE kept his scheduled appointment to complete the masonry work on Saturday, November 6, 2010.  He arrived at the Church carrying a small pail of mortar with which to execute the necessary repointing.  It was readily apparent that (1) the extent of the necessary mortar repointing work was enormous, not just a little "filling" and "patching," and (2) it was too cold to do mortar work.   After executing a few patchwork mortar repairs, CAVE informed Lofgren that he could not proceed any further,

and he therefore promised Lofgren to return next spring (when temperatures would be warm enough) to complete the necessary mortar repointing work.

42.     In two letters dated March 24, 2011, George S. Papastamatiou (hereinafter "Papastamatiou"), Artist, Byzantine Artworks, LLC, provided Lofgren Byzantine Artworks' two proposals for the restoration of the water damaged painted mural of "Christ Pantocrator [Almighty]" located in the apse of the Altar of the Church.  (Exhibits Nos. 20 and 21).  The cost quoted for the first and second proposals were $35,000 and $63,000, respectively.  The difference between the two being due in part to the use of more costly materials (e.g., replacing existing imitation 23-karat gold leaf with 23-karat gold leaf, etc.), and more thorough restoration work to the areas immediately surrounding the mural.

43.     With the arrival of the early spring of 2011, Lofgren wrote BURNS a follow-up electronic mail dated March 25, 2011, in which he expressed his continued disappointment with the unresponsive CAVE, the significant necessary mortar repointing work to be done, and once again requested BURNS visit the Church for a meeting to view the defects and discuss ARTECH's proposed solutions.  (Exhibit No. 22).

44.     In an electronic mail dated March 29, 2011 (Exhibit No. 23), an exasperated yet ever hopeful Lofgren wrote BURNS the following desperate plea for help:

> Bill:   Mike Cave called today.   He seems to have some personal work/financial issues.  He said he would 'hire' a person to do the mortar

work in late May.   Frankly, I think we deserve resolve to this issue immediately.

The roof work has been completed [by Foley] and the mortar work on the roof needs to be completed so we know we are water tight from above. Then we can proceed to repair the damaged area inside the church due to the water intrusion.

The temperature should accommodate mortar work the first of the month (April).   I would like to have you 'hire' a local contractor that we can agree on.   Perhaps we can chat about this.   I still think that you should come and view the problem(s) first hand for yourself.   There is a considerable amount of mortar work to be done and re-done.

We contracted with you for the restoration work quite a while ago now and we deserve resolution to the problems that should have been dealt with & some that should have been avoided as well.

We are attempting to "grow" our church.  The "restoration' was a piece of that initiative.  We will now have another Holy Week (Easter week in April) with the church looking poorly in the two areas effected.

We need your cooperation for speedy resolve.  Please contact me a.s.a.p. to discuss.

Best, Ed Lofgren

45.     Upon information and belief, neither BURNS, CAVE nor anyone else from ARTECH ever responded to Lofgren's March 25, 2011 electronic mail, or for that matter ever again.

46.     In a letter dated July 7, 2011, Foley provided Lofgren M. G. Foley Construction's proposal for the necessary mortar repointing work to seal the exterior building envelope of the Church (Exhibit No. 24), and Flynn Roofing Co.'s proposal for roofing services to install new lead step flashing on the

Church's walls (Exhibit No. 25).   The cost quoted for the two proposals totaled $99,000.00.   This consisted of $63,000.00 for the necessary mortar repointing work, and $36,000.00 to remove the existing flashing from the Church's exterior walls, inspect the condition of the mortar joints under the flashing to evaluate the necessity of any repointing, and thereafter install new lead step flashing.

47.     In a "30-Day Demand Letter" dated October 25, 2011, Frederic P. Zotos, Esq. (hereinafter "Attorney Zotos"), representing Panagia, wrote BURNS and ARTECH a written demand for relief on behalf of Panagia, in full compliance with the requirements of the provisions of Mass. Gen. L. ch. 93A, § 9.   (Exhibit No. 26).   This Demand Letter was sent the same day by certified United States first-class mail, return-receipt requested, to BURNS at ARTECH's business address as it appears in the Contract - 12 Mill Plain Rd., Danbury, CT 06811, and was delivered on November 1, 2011.   The Demand Letter identified the claimant Panagia by its full name and address.   It included a reasonable description of the unfair or deceptive act or practice relied upon, the dates involved in the transaction, other important facts, and included Panagia's following claim:

> It is Panagia's claim that Artech has clearly breached both the express provisions and the covenant of good faith of it's Contract with Panagia by either wholly failing to perform in its obligation to waterproof the exterior of the church, or by waterproofing of the exterior of the church in a grossly negligent and unworkmanlike manner by unqualified craftsmen. In addition, Artech has clearly breached the express warranty under it's Contract with Panagia by utterly failing to subsequently resolve the exterior water intrusion problem after timely notification by Panagia well within the one-year period of the express warranty.
>
> Moreover, these unfair or deceptive acts, omissions and practices committed against Panagia by Artech are, in my opinion, declared

23

unlawful by Massachusetts General Laws, Chapter 93A, entitled "The Regulation of Business Practices for Consumers Protection," Section 2, entitled "Unfair Practices."

48.    The 30-Day Demand Letter furthermore clearly explained the injury Panagia suffered as a result of BURNS and ARTECH's unlawful acts, summarized as follows:

> As a direct and proximate consequence of Artech's unfair or deceptive acts, omissions and practices, Panagia has suffered with certainty, and continues to suffer with certainty, the injury of significant interior water damage caused by exterior water intrusion in the currently estimated amount of $223,625 as outlined above.  This amount is exclusive of my attorney's fees incurred by Panagia to assess it's potential legal claims and advise it in this matter – now approaching a total of $7,500 to date.

49.    The 30-Day Demand Letter also included a statement of Panagia's four (4) demands for relief totaling $223,625, and Panagia's attorney's fees owed to Attorney Zotos in the amount of $7,500.  In conclusion, the Demand Letter requested BURNS and ARTECH's good-faith response within thirty (30) days in accordance with Chapter 93A, § 9.  Attached, thereto, was Attorney Zotos' Certificate of Service on BURNS and ARTECH.

50.    In a letter response dated November 30, 2011, John McCormack (hereinafter "Attorney McCormack"), Sloane and Walsh, LLP, representing ARTECH, wrote Attorney Zotos in response to his 30-Day Demand Letter on behalf of ARTECH, apparently in order to comply with the provisions of Mass. Gen. L. ch. 93A, § 9.  (Exhibit No. 27).  However, Attorney McCormack made no written tender of settlement in accordance with the provisions of Mass. Gen. L.

ch. 93A, § 9.  In short, he informed Attorney Zotos "we see no liability on the part of our client [ARTECH] and no offer of settlement will be made."  Consequently, BURNS and ARTECH forced Panagia to litigate its claim to obtain relief.

51.     On May 3, 2012, Lofgren hired CBI Consulting Inc. (hereinafter "CBI"),  a construction engineering  consulting firm, to inspect the Church's building envelope and evaluate masonry repairs relating to interior water leakage. On May 21, 2012, Robert G. Wilkin, P.E. (hereinafter "Engineer Wilkin"), CBI, inspected the Church building envelope on behalf of its client Panagia.   On September 6, 2012, Engineer Wilkin produced his photographic evaluation report. (Exhibit  No.  28).     Engineer  Wilkin's  documented  "Conclusions  and Recommendations" included the following (emphasis added):

- In general, **the main source of the leakage into the sanctuary of the church appears to be from water penetrating the stone masonry through poorly pointed and open mortar joints and cracks in the mortar**.

- Numerous mortar joints were found with loose pointing mortar due to poor repointing work from the restoration contractor as well as earlier masons.  It was difficult to determine which work was done most recently, except for a few locations where the mortar was spread over the face of the stonework with no attempt to cut joints properly in advance, or to properly tint or finish each joint.  Since at least three (3) types of repointing were observed and all were poorly performed, we can say with no hesitation that the latest **work was also poorly done and not in accordance with industry standards**.

- We found only a limited number of mortar joints that appear to have been recently repointed, likely less than 1% of the joints.  We also **found on average approximately fifty percent (50%) of the joints to be defective** with failing mortar or cracked allowing water to penetrate through the face of the masonry entering into the wall system

and reach the interior.   The incidence of defective mortar joints appeared to increase with elevation relative to the easily accessible ground level

- The penetrating clear sealer was found to be working properly but will not seal openings in the masonry and is therefore essentially of limited use.   **The manufacturer specifically warns that all cracks and penetrations in the masonry be repaired before the sealer is applied.   This application was in direct conflict with that requirement from the manufacturer**.

- Mortar joints appeared to have been sealed over with a bead of urethane sealant and this sealant has been removed leaving residue on the stones and the deteriorated joint exposed.   Many of the formerly sealed joints are cracked and open.   **These joints appear to have been exposed by the high pressure water cleaning process and never were repointed**.

- CBI recommends cutting out 100% of the joints in the stone masonry 1" minimum and repointing the joints with a type N mortar.   We calculated that there is an average of 2.5" of joint per square foot of masonry and there is approximately 5,000 square feet of masonry.   The cost of repointing the 12,500 feet of joints, at $17.00 per foot, would be $358,400.   The cost of repointing fifty percent (50%) would be $212, 700.

- We also recommend restoring the copper counterflashing and resealing the window perimeters.

## CLAIMS FOR RELIEF

## COUNT I

(Breach of Contract against Defendant Artech)

52.     Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

53.     On or about June 22, 2009, Plaintiff and Defendant entered into a written construction Contract in which Defendant agreed to repair and restore Plaintiff's Church located at 811 Jerusalem Road, Cohasset, Massachusetts for a total consideration of $122,025.00.   A true and accurate executed copy of said Contract is attached hereto, marked Exhibit No. 9, supra, and incorporated by reference herein.

54.     According to the terms of the Contract, Defendant specifically agreed to waterproof the exterior and restore the interior of the Church.   At all relevant times, Defendant had an obligation and duty to repair and restore Plaintiff's Church in accordance with the terms and conditions of the Contract and specifications set forth therein, and with the manufacturer's instructions and specifications for materials used.

55.     At all relevant times, Plaintiff complied with its obligations under the Contract and performed all of the conditions of the Contract on its part.   On or about October 6, 2009, Plaintiff reasonably knew of no defects or omissions in the restoration of the Church provided for in the Contract, and Plaintiff delivered to

Defendant its check No. 106, in the amount of $15,405, as final, full and complete payment on the $122,025.00 Contract.

56.     Defendant breached the Contract with Plaintiff in numerous respects including but not limited to failing its duty to properly repair and restore Plaintiff's Church in accordance with the terms and conditions of the Contract and specifications set forth therein, namely by failing to repoint all loose and missing mortar joints.

57.     Defendant breached the Contract with Plaintiff in numerous respects including but not limited to failing its duty to properly repair and restore Plaintiff's Church in accordance with the manufacturer's instructions and specifications for materials used, namely Conproco Corporation's strict surface preparation requirements for application of Conpro Shield MX waterproof sealer, by failing to inspect flashing around all openings, caulking, expansion joints and roof components to determine condition and for evidence of water entry; failing to repoint loose deteriorating mortar; and failing to fill all voids and cracks in mortar and missing mortar joints.

58.     Defendant's breach of the Contract is material and in no way constitutes substantial performance of the terms of said Contract.

59.     As a direct and proximate result of Defendant's breach of its duty to the Plaintiff, Plaintiff has been damaged in an amount of no less than $212,700,

which is the estimated cost to repair the Church's loose or missing mortar joints and thereafter re-apply the waterproof sealer to conform to the Contract.

## COUNT II

(Breach of Unqualified Express Guarantee against Defendant Artech)

60.     Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

61.     At all relevant times, Defendant was a construction contractor, engaged in the design-build repair and restoration of the exterior and interior of church buildings.

62.     Among others things, the Contract included Defendant's unqualified, express guarantee of the continued quality of all workmanship for a period of one year from the date of project completion, which occurred on October 6, 2009.

63.     In reliance upon Defendant's express guarantee, which formed part of the basis of the bargain, Plaintiff entered into the Contract to repair and restore the Plaintiff's Church.

64.     At all relevant times, Plaintiff complied with its obligations under the Contract and performed all of the conditions of the Contract on its part.  On or about October 6, 2009, Plaintiff reasonably knew of no defects or omissions in the restoration of the Church provided for in the Contract, and Plaintiff delivered to

Defendant its check No. 106, in the amount of $15,405, as final, full and complete payment on the $122,025.00 Contract.

65.     On or about February 24, 2010, interior areas of Plaintiff's Church that the Defendant recently restored had once again suffered water damage. When these latent defects were noticed by Plaintiff, Defendant was notified of them by Plaintiff's President, Lofgren, and was continuously notified and kept informed of the status of these defects during the following months, and was further notified the defects were becoming worse.

66.     Throughout 2010, numerous inspections of the Church had taken place by Plaintiff and Defendant, and substantial defects in the restoration had been identified.

67.     Prior to the expiration of the express guarantee period, Plaintiff notified Defendant by letter dated September 21, 2010, and called to its attention the defects that had developed, and gave Defendant reasonable notice to make the necessary repairs and restoration to correct these defects as required by its unqualified express guarantee.

68.     On or about October 6, 2010, Defendant ARTECH by its president BURNS admitted to Plaintiff during a site inspection meeting that the restoration of the Church was defective and acknowledged that the defects were unacceptable.  During this meeting, Defendant by its president BURNS agreed to remedy the defects at no charge to the Plaintiff.

69.     Despite numerous representations and assurances by Defendant, on or about November 6, 2010, Defendant attempted, and shortly thereafter abandoned, patchwork repairs to the substantial defects in the Church.

70.     Defendant breached its unqualified express guarantee to the Plaintiff when it failed or refused to take any further action thereafter to rectify and correct the substantial defects, and instead set about to ignore Plaintiff's further pleas for assistance.

71.     As a direct and proximate result of Defendant's breach of its unqualified express guarantee to Plaintiff, Plaintiff has been damaged in the estimated amount of $271,725 for defects in the Church which developed prior to the expiration of the express guarantee period in the Contract; which includes $212,700 to repair the Church's loose or missing mortar joints and thereafter re-apply the waterproof sealer to conform to the Contract; $21,975 and $34,450 to re-repair and re-restore the water damaged areas of the Narthex and Sanctuary, respectively; and $2,600 to apply silicone caulking window sealant having a thirty-five (35) year warranty to conform to the Contract.

## COUNT III

(Breach of Implied Warranty of to do a Workmanlike Job

against Defendant Artech)

72.     Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

73.     When Defendant bound itself by Contract to repair and restore Plaintiff's Church, Defendant agreed by implication to do a workmanlike job, to use reasonable and appropriate care and skill in doing it, and that it would exercise the standard of care required of its construction profession.

74.     Defendant breached its implied warranty to the Plaintiff to do a workmanlike job when it failed to carefully power wash the exterior so as not to further damage the existing mortar and urethane sealant.

75.     Defendant breached its implied warranty to the Plaintiff to do a workmanlike job when it failed to properly repoint loose and missing mortar.

76.     Defendant breached its implied warranty to the Plaintiff to do a workmanlike job when it failed to inspect flashing around all openings, caulking, expansion joints and roof components to determine condition and for evidence of water entry, before it applied Conpro Shield MX water sealer to the stone substrate.

77.     Defendant breached its implied warranty to the Plaintiff to do a workmanlike job when it failed to properly prepare the stone substrate, leaving voids and cracks in the mortar, and then improperly applied Conpro Shield MX water sealer to the stone substrate.

78.     Defendant further breached its implied warranty to the Plaintiff to do a workmanlike job when it failed to recognize obvious loose and missing mortar defects in the Church, and then failed to rectify these obvious defects.

79.     Defendant further breached its implied warranty to the Plaintiff to do a workmanlike job by permitting loose and missing mortar defects to exist in the Church, and then failing to rectify any of the defects identified.

80.     As a direct and proximate result of Defendant's breach of its implied warranty to the Plaintiff to do a workmanlike job, Plaintiff has been damaged in the estimated amount of $306,725 for defects in the Church which developed prior to the expiration of the implied warranty period; which includes $212,700 to repair the Church's loose or missing mortar joints and thereafter re-apply the waterproof sealer to conform to the Contract; $21,975 and $34,450 to re-repair and re-restore the water damaged areas of the Narthex and Sanctuary, respectively; $2,600 to apply window sealant; and $35,000 to restore the water damaged painted mural of "Christ Almighty" located in the apse of the Altar of the Church.

## COUNT IV

(Negligent Construction and Defective Workmanship against Defendant Artech)

81.     Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

82.     Defendant owed a duty to the Plaintiff to perform all repair and restoration work on Plaintiff's Church in a good and workmanlike manner, to use reasonable and appropriate due care and skill in doing it, and exercise the standard of care required of its construction profession.

83.     Defendant was negligent and breached its duty to the Plaintiff when it failed to use due care in power washing the exterior of the Church so as not to further damage the existing mortar and urethane sealant.

84.     Defendant was negligent and breached its duty to the Plaintiff when it failed to use due care in properly repointing loose and missing mortar.

85.     Defendant was negligent and breached its duty to the Plaintiff when it failed to use due care to inspect flashing around all openings, caulking, expansion joints and roof components to determine condition and for evidence of water entry, before it applied Conpro Shield MX water sealer to the stone substrate.

86.     Defendant was negligent and breached its duty to the Plaintiff when it failed to use due care in properly preparing the stone substrate, leaving

voids and cracks in the mortar, and then improperly applied Conpro Shield MX water sealer to the stone substrate.

87.     Defendant was negligent and further breached its duty to the Plaintiff when it failed to use due care to recognize obvious loose and missing mortar defects in the Church, and then failed to rectify these obvious defects.

88.     Defendant was negligent and further breached its duty to the Plaintiff by permitting loose and missing mortar defects to exist in the Church, and then failing to rectify any of the defects identified.

89.     As a direct and proximate result of Defendant's negligence and breach of its duty to the Plaintiff to perform all repair and restoration work on Plaintiff's Church with due care, Plaintiff sustained property injuries in the estimated amount of $306,725 for defects in the Church; which includes $212,700 to repair the Church's loose or missing mortar joints and thereafter re-apply the waterproof sealer to conform to the Contract; $21,975 and $34,450 to re-repair and re-restore the water damaged areas of the Narthex and Sanctuary, respectively; $2,600 to apply window sealant; and $35,000 to restore the water damaged painted mural of "Christ Almighty" located in the apse of the Altar of the Church.

## COUNT V

*(Breach of Implied Covenant of Good Faith and Fair Dealing*

*against Defendant Artech)*

90.     Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

91.     As a result of Defendant's representations and warranties, and in accordance with the terms of the Contract, Defendant specifically agreed, and Plaintiff reasonably expected Defendant to waterproof the exterior of the Church.

92.     At all relevant times, Defendant owed Plaintiff a covenant of good faith and fair dealing to meet Plaintiff's reasonable expectations and successfully waterproof the exterior of the Church so that Plaintiff would receive the benefits of its bargained-for Contract.

93.     On or about October 6, 2010, Defendant ARTECH by its president BURNS admitted to Plaintiff during a site inspection meeting that the restoration of the Church was defective and acknowledged that the defects were unacceptable.  During this meeting, Defendant by its president BURNS agreed to remedy the defects at no charge to the Plaintiff.

94.     Despite these admissions and representations, Defendant subsequently failed to rectify and correct the substantial defects in the Church, and instead shortly thereafter set about to ignore Plaintiff's further pleas for assistance, and eventually finally refused to take any further action to rectify and

correct the substantial defects.  These actions and broken promises indicate that Defendants at no time had any intention of correcting the substantial defects in the Church.

95.     As a direct and proximate result of Defendant's breach of its a covenant of good faith and fair dealing to meet Plaintiff's reasonable bargained-for expectations, Plaintiff has been damaged in the estimated amount of $271,725 for defects in the Church which developed prior to the expiration of the express guarantee period in the Contract; which includes $212,700 to repair the Church's loose or missing mortar joints and thereafter re-apply the waterproof sealer to conform to the Contract; $21,975 and $34,450 to re-repair and re-restore the water damaged areas of the Narthex and Sanctuary, respectively; and $2,600 to apply window sealant.

## COUNT VI

((Unfair Trade Practices and Mass. Gen. L. ch. 93A, §§ 2 and 9

against Defendants Artech and Burns, in his official, individual and

personal capacities, jointly and severally)

96.     Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

97.     At all relevant times, Plaintiff was a religious corporation, a "person" within the meaning Mass. Gen. L. ch. 93A, § 9, not a "person" engaged in engaged in "trade or commerce" within the meaning Mass. Gen. L. ch. 93A, § 11.

98.     At the time of execution of the Contract, Defendants represented to Plaintiff that they were experienced contractors, and fully qualified and capable of undertaking and completing the contemplated repair and restoration work.  Upon information and belief, Defendants do not maintain a place of business or keep assets in the Commonwealth of Massachusetts.

99.     Before entering into the Contract, Plaintiff told the Defendants that it was critical the exterior of the Church was made water "tight" as part of any restoration and repair work.   The Defendants represented and warranted to Plaintiff that their "External Waterproofing" repair and restoration services would seal the building envelope, prevent external water leakage, and protect the interior from recurring water damage.

100.   In reliance upon Defendants representations, warranties and unqualified express guarantee, all which formed part of the basis of the bargain, Plaintiff entered into the Contract to repair and restore the Plaintiff's Church.

101.   Plaintiff insisted Defendants repair and restore the exterior of the Church so as to make it water "tight" before it would permit Defendants to work on the interior of the Church.  In compliance with Plaintiff's request, Defendants represented and warranted to Plaintiff they had thoroughly inspected the building envelope for causes of outside water leaks, and had successfully sealed the building envelope and made it water "tight" as part of their "External Waterproofing" repair and restoration services, before beginning work on the interior of the Church.

102.   The statements and representations made to the Plaintiff by the Defendants to the effect that the Exterior Waterproofing was performed in accordance with the terms of the Contract and that the Church's exterior was made water 'tight" thereby, were false and were known by Defendants to be false at the time of utterance; the statements were made with the intent to deceive and defraud Plaintiff and did actually deceive Plaintiff, and induced Plaintiff, who relied on the truth of the statements by Defendants, to pay Defendant $112,025.00 for the repairs.

103.    Contrary to Defendants representations and warranties to Plaintiff that the exterior building envelope was water "tight," on or about February 24, 2010, interior areas of Plaintiff's Church that the Defendant recently restored had once again suffered outside water leak damage.

104.    Contrary to Defendants representations and warranties to Plaintiff that Defendants had successfully completed all the repair and restoration work as specified in the Contract, throughout 2010, numerous inspections of the Church took place by Plaintiff and Defendant, and substantial defects and omissions in the restoration had been identified, namely the Defendants failure to repoint all loose and missing mortar joints.

105.    The acts and practices of the Defendants in misrepresenting that they had completed all the their "External Waterproofing" work in accordance with the Contract, and that this made the building envelope water "tight," constitutes an unfair or deceptive act or practice pursuant to Mass. Gen. L. ch. 93A, §§ 2 and 9.

106.    The acts and practices of the Defendants in admitting that their repair and restoration of the Church was defective, acknowledging that the defects were unacceptable, and assuring to remedy the defects at no charge to the Plaintiff, and then failing to acknowledge and/or correct identified defects constitutes an unfair or deceptive act or practice pursuant to Mass. Gen. L. ch. 93A, §§ 2 and 9.

107.    The acts and practices of the Defendants in failing to perform or fulfill their promises and obligations arising under their unqualified express guarantee and implied warranties by failing to acknowledge and/or correct identified defects constitutes an unfair or deceptive act or practice pursuant to Mass. Gen. L. ch. 93A, §§ 2 and 9.

108.    The acts and practices of the Defendants in breaching the covenant of good faith and fair dealing by failing to acknowledge and/or correct identified defects in their "Exterior Waterproofing" workmanship constitutes an unfair or deceptive act or practice pursuant to Mass. Gen. L. ch. 93A, §§ 2 and 9.

109.    The acts and practices of the Defendants in failing, refusing, and neglecting, despite repeated requests by Plaintiff therefor, to perform under the terms of and according to the plans and specifications set forth in the Contract, in that Defendants so negligently and carelessly performed the exterior waterproofing work as to require that all the exterior waterproofing be redone, constitutes an unfair or deceptive act or practice pursuant to Mass. Gen. L. ch. 93A, §§ 2 and 9.

110.    Defendants representations, warranties, guarantees, promises and assurances to the Plaintiff were made knowingly, willingly, recklessly or negligently.

111.    As a result of the unfair or deceptive acts or practices of the Defendants, the Plaintiff has been damaged in the estimated amount of $306,725

for defects in the Church; which includes $212,700 to repair the Church's loose or missing mortar joints and thereafter re-apply the waterproof sealer to conform to the Contract; $21,975 and $34,450 to re-repair and re-restore the water damaged areas of the Narthex and Sanctuary, respectively; $2,600 to apply window sealant; and $35,000 to restore the water damaged painted mural of "Christ Almighty" located in the apse of the Altar of the Church.

112.   On October 25, 2011, Plaintiff, through its Attorney Zotos, sent Defendants by certified mail, return receipt requested, postage prepaid, a written demand for relief pursuant to Mass. Gen. L. ch. 93A, § 9, identifying the claimant and reasonably describing the unfair acts or practices relied upon and the injuries suffered.  A copy of said demand letter is attached hereto, marked Exhibit No. 26, supra, and incorporated by reference herein.

113.   On December 1, 2011, the Plaintiff's Attorney Zotos received a letter from the Defendants' Attorney McCormack, in reply to the October 25, 2011, demand letter of the Plaintiff.   The reply from Attorney McCormack refused to make a settlement of relief to the Plaintiff.  A copy of said reply letter is attached hereto, marked Exhibit No. 27, supra, and incorporated by reference herein.

114.   Defendants refusal to grant relief upon Plaintiff's October 25, 2011 demand letter was made in bad faith with knowledge or reason to know that the act or practice complained of violated Mass. Gen. L. ch. 93A, § 2.

115.    Defendant BURNS was fully involved in every aspect of the transaction between Defendant ARTECH and Plaintiff, including the false representations and assurances of contractual performance, and willful failure to perform or fulfill his promises and obligations arising under the express guarantee and implied warranties which are at the core of his violations of Mass. Gen. L. ch. 93A, § 2.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Honorable Court award the following relief to the Plaintiff and judgment against Defendants, jointly and severally, as follows:

1. for compensatory damages, including nominal, actual, consequential and incidental damages according to proof;

2. for treble damages as provided by Mass. Gen. L. ch. 93A, § 9(3);

3. for pre-judgment interest;

4. for costs and reasonable attorney's fees;

5. grant such further relief as this Honorable Court may deem equitable, just and appropriate.

Plaintiff,
By its attorney,

FREDERIC P. ZOTOS

*/s/ Frederic P. Zotos*

Frederic P. Zotos, Esq.
BBO#565308
28 Old Coach Road
Cohasset, MA 02025
Tel: (781) 836-4295
E-Mail: fzotos@gmail.com

Dated: September 7, 2012