UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SOUTH SHORE HELLENIC CHURCH, INC.,
a/k/a "NATIVITY-ASSUMPTION OF THE
VIRGIN MARY GREEK ORTHODOX CHURCH,"
"NATIVITY OF THE VIRGIN MARY GREEK
ORTHODOX CHURCH," "NATIVITY OF THE
VIRGIN MARY/PANAGIA," "PANAGIA GREEK
ORTHODOX CHURCH," and "PANAGIA
CHURCH,"
    Plaintiff,

    v.                             CIVIL ACTION NO.
                                      12-11663-GAO

ARTECH CHURCH INTERIORS, INC. and
WILLIAM BURNS, Individually, and
as President, Artech Church
Interiors, Inc.,
    Defendants/Third Party
    Plaintiffs,

    v.

MICHAEL J. CAVE, CORP., a/k/a MICHAEL
J. CAVE CORP. OF MASSACHUSETTS, and
JAMES J. AMIRAULT d/b/a JIM'S PRO
PLASTERING,
    Third Party Defendants.

**REPORT AND RECOMMENDATION RE:**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**(DOCKET ENTRY # 91); MICHAEL J. CAVE CORPORATION'S MOTION FOR**
**SUMMARY JUDGMENT (DOCKET ENTRY # 92); DEFENDANT, ARTECH CHURCH**
**INTERIORS, INC. AND WILLIAM BURNS' MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 95)**

**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION TO DEEM ITS STATEMENT OF**
**UNDISPUTED MATERIAL FACTS ADMITTED**
**(DOCKET ENTRY # 109)**

**February 19, 2016**

BOWLER, U.S.M.J.

    Pending before this court are motions for summary judgment

filed by defendants Artech Church Interiors, Inc. ("Artech") and William Burns ("Burns") (collectively "defendants") and by third party defendant Michael J. Cave Corporation ("Cave") in this breach of contract action involving repairs to the Panagia Greek Orthodox Church in Cohasset, Massachusetts.  (Docket Entry ## 92, 95).  Plaintiff South Shore Hellenic Church, Inc. ("SSHC") moves for partial summary judgment on a claim under Massachusetts General Laws chapter 93A ("chapter 93A"), section nine.  (Docket Entry # 91).  Defendants move to strike various paragraphs in SSHC's Local Rule 56.1 statement of undisputed facts.  (Docket Entry # 109).  After conducting a hearing, this court took the motions (Docket Entry ## 91, 92, 95) under advisement.

## PROCEDURAL BACKGROUND

The amended complaint sets out the following causes of action solely against Artech:  (1) breach of contract (Count I); (2) breach of an express guarantee in the contract (Count II); (3) breach of an implied warranty to do a workmanlike job (Count III); (4) negligence (Count IV); and (5) breach of the implied covenant of good faith and fair dealing (Count V).  Count VI against Artech and Burns, as an individual and officer of Artech, alleges a violation of chapter 93A, section nine. Plaintiff moves for summary judgment on the chapter 93A claim,

alleging that defendants materially breached an "unconditional guarantee." (Docket Entry # 91).

Defendants move for summary judgment on the basis that SSHC lacks Article III standing because it is not a party to the contract. (Docket Entry # 95). Defendants also seek, in the alternative, summary judgment on the chapter 93A claim due to an absence of facts supporting unfair and deceptive business practices. (Docket Entry # 95).

Defendants filed a third party complaint against Cave and James J. Amirault d/b/a Jim's Pro Plastering ("Jim's Pro") (collectively "third party defendants"). The third party complaint sets out the following causes of action brought by defendants against Cave: (1) contribution (Count I); (2) common law indemnification (Count II); (3) breach of contract and the covenant of good faith and fair dealing (Count III);[1] and (4) breach of implied warranty (Count IV). (Docket Entry # 53). The third party complaint also sets out the following causes of action against Jim's Pro: (1) contribution (Count V); and (2) common law indemnification (Count VI). (Docket Entry # 53). Cave moves for summary judgment on all of the counts against him. (Docket Entry # 92).

---

[1] Count III is captioned as brought only by Artech against Cave. The paragraphs specific to Count III, however, clarify that Burns as well as Artech are bringing the claim.

3

STANDARD OF REVIEW

Summary judgment is designed "to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Tobin v. Fed. Express Corp., 775 F.3d 448, 450 (1st Cir. 2014). It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008). "'[A] fact is material if it has the potential to determine the outcome of the litigation.'" Davalia v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).

When "the parties have filed cross-motions for summary judgment, the court must 'determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir.

4

2010).  Facts and ''all reasonable inferences'' are drawn ''in
the light most favorable to the nonmoving party.''  <u>Id.</u>  The
factual background includes a number of disputed facts which this
court resolved in favor of the non-moving party in the discussion
section.  Finally, in adjudicating one or more of the summary
judgment motions, this court may consider not only the cited
materials, but also ''other materials in the record.''
Fed.R.Civ.P. 56(c)(3).

FACTUAL BACKGROUND

SSHC is a corporation organized under Massachusetts law
with a stated purpose "[t]o develop and operate an Eastern
Orthodox (Greek) Church under the auspices of the Greek Orthodox
Church of North and South America."  (Docket Entry # 100-2).  On
November 26, 1980, SSHC purchased the Pope Memorial Church
located at 811 Jerusalem Road in Cohasset.  (Docket Entry # 100,
¶ 2) (Docket Entry # 112, ¶ 2).  SSHC's principle place of
business is located at the same address.  (Docket Entry # 100, ¶
3) (Docket Entry # 112, ¶ 3).  After the purchase, the Pope
Memorial Church became a Greek Orthodox Church ("the Church").
(Docket Entry # 100, ¶ 4) (Docket Entry # 112, ¶ 4).  The Church
was named "the 'Panagia Greek Orthodox Church,'" which, is one
of several adopted trade names for SSHC.  (Docket Entry # 100-1,
¶¶ 7, 8).[2]  On or about the summer of 1997, the Church was

---

[2]  This material fact is disputed.  The above statement is made

formally consecrated as the "Nativity-Assumption of the Virgin Mary Greek Orthodox Church." (Docket Entry # 100, ¶ 6) (Docket Entry # 112, ¶ 6).

In the spring of 2009, SSHC's board of stewards decided to undertake repairs to restore the Church. (Docket Entry # 90, ¶ 6) (Docket Entry # 104, ¶ 6). In his affidavit, Edwin R. Lofgren, president of the board at the time, stated that the purpose of these repairs were "to restore the water damaged interior and waterproof the exterior of the Church."[3] (Docket Entry # 90-1, ¶ 9). In his deposition, Lofgren testified that the Church seriously considered Artech and one other contractor. (Docket Entry 115-2, p. 44).[4]

During the spring of 2009, Lofgren and Burns spoke over the telephone and met at the Church to discuss repair work to the Church. (Docket Entry # 100, ¶ 9) (Docket Entry # 112, ¶ 9) (Docket Entry # 90-53, p. 91). Cave also met Lofgren at the Church during this time period to look at the Church and review the Church's needs for the restoration work. (Docket Entry #

---

when the record is viewed in favor of SSHC. Other evidence in the record allows a fact finder to conclude that Panagia Greek Orthodox Church is not a trade name for SSHC, including Peter Bourikas' deposition (Docket Entry # 115-1, p. 56).

[3] Defendants deny that SSHC's board of stewards decided to waterproof the exterior of the Church. (Docket Entry # 104, ¶ 6).

[4] The page number refers to the docketed page number.

90-8, pp. 93-94).  At one point, they discussed the existing roof.  (Docket Entry # 90-8, p. 99).

Following a series of five revisions to the proposed contract work, Burns sent Lofgren another proposal or quote in letter form on June 18, 2009.  (Docket Entry # 90-5).  The four-page letter contained seven separately priced categories of work, each with subparagraphs, for a total cost of $116,625 and a $4,600 discount if the work was "done at the same time." (Docket Entry # 90-5).  The quote identified Cave as "Artech Project Manager."  (Docket Entry # 90-5).  Thomas Burns attests that Cave was not an employee of Artech.  (Docket Entry # 97-3).

Burns signed the final quote as president.[5]  (Docket Entry # 90-5).  The contract did not include an integration clause. (Docket Entry # 90-5).  Underneath Burns' signature appears language that states, "By signing below, we agree to contract Artech Church Interiors for the work selected."  (Docket Entry # 90-5).  Below this language is a line for a "Purchaser

---

[5]  Underneath Burns' name is the title "President."  (Docket Entry # 9-13).  Defendants challenge that Burns signed the document as president, alleging that this was a clerical error. (Docket Entry # 112, ¶ 15).  Defendants point to testimony in a deposition in which Burns stated he was the treasurer and secretary.  (Docket Entry # 112, ¶ 15) (Docket Entry # 115-3, pp. 35-36).  By affidavit, Thomas Burns attests that he is the president of Artech.  (Docket Entry # 97-3).  Despite this, Burns states that he was authorized to execute contracts on behalf of Artech.  (Docket Entry # 90-53, p. 141).

Representative" and underneath this line is a signature line.
(Docket Entry # 90-5).  On June 22, 2009, Lofgren as "Parish
Council President" wrote and signed his name on the signature
line.  (Docket Entry # 90-5).  "Panagia Greek Orthodox Church"
is the designated purchaser representative.  (Docket Entry # 90-
5).  The address line in the upper left corner of the initial
check payable to Artech for a one-third deposit due with [the]
signed contract and dated June 22, 2009 reads, "Panagia Greek
Orthodox Church" at 811 Jerusalem Road in Cohasset.  (Docket
Entry # 9-14).

      The contract included a category for "[e]xterior
[w]aterproofing" for a total of $16,900 with a subcategory to
repoint "[a]ll loose and missing mortar joints".[6]  (Docket Entry
# 90-5).  An additional subcategory stated, "Exterior will be
power washed".  (Docket Entry # 90-5).  A category for the
"Narthex" for a total of $27,175 likewise included a subcategory
to "have old loose or missing mortar replaced."  (Docket Entry #
90-5).  The contract represented that "qualified craftsmen"
would execute the work and that, "Artech Church Interiors
guarantees all workmanship for a period of one year from the
date of project completion."  (Docket Entry # 90-5).  One of the

---

[6]  Bourikas testified that he did not ask anyone to replace 100%
of the mortar on the building.  (Docket Entry # 115-1, p. 59).

terms of the contract was the one-third deposit with the signed contract.  (Docket Entry # 90-5).  There was also a requirement that, "Once work begins, weekly progress payments will be due until completion."  (Docket Entry # 90-5).

On June 29, 2009, Lofgren and Joanne S. Kelley, another member of the Church's board of stewards, executed a "Commercial Deposit Account Resolutions & Authorities on behalf of 'South Shore Hellenic Church, Inc., DBA Nativity of the Virgin Mary/Panagia'" to open a checking account with the Rockland Trust Bank.  (Docket Entry # 100, ¶ 8) (Docket Entry # 112, ¶ 8).  The checks do not identify SSCH in the address line.  (Docket Entry # 9-17).  It is undisputed that plaintiff's contracting documents and the related documents, which were shared with defendants, do not refer to SSHC.  (Docket Entry # 98, ¶ 10) (Docket Entry # 97, ¶ 10).

In late June 2009, Cave and a crew of workers (collectively "the construction workers") undertook the construction work to restore the Church.  The work progressed throughout the summer.  (Docket Entry # 90, ¶ 11) (Docket Entry # 104, ¶ 11).  Cave and his crew, as opposed to an employee of Artech, performed the actual construction work on the building.  (Docket Entry # 97-3).  When Cave "first came on the job," Lofgren asked him "to make darn sure that the exterior was watertight" before doing

9

any internal restoration work.  (Docket Entry # 115-2, pp. 54, 55).

As part of the work, the construction workers set up scaffolding around the exterior tower of the Church.  (Docket Entry # 90-8, p. 36).  Next, the crew power washed the Church using a Rigid 3,000 pounds of pressure per square inch power washer.  (Docket Entry # 90-8, pp. 29, 121-123) (Docket Entry # 90-12, p. 24).  The power washer included several color coded tips corresponding to different dimensions of the stream of water produced with the particular tip.  A red tip produced the straightest stream of water and therefore the highest pressure.  A green tip produced a medium pressure six inch fan of water and a white tip produced an even wider and lower pressure stream.  (Docket Entry # 90-8, pp. 122-123) (Docket Entry # 90-12, pp. 29-30, 54).  Cave along with two other construction workers (Kyle Goehle and Mike Callahan) power washed the tower with bleach mixed with water using the green tip.  (Docket Entry # 90-8, pp. 122-128) (Docket Entry # 90-12, pp. 55-56).[7]  Goehle testified that the power washing uncovered and loosened mortar on the Church's exterior.  (Docket Entry # 90-17, pp. 176-177).

---

[7]  Elsewhere during his deposition, Cave testified that white and green tips were used and that the green tip produced a 12 inch fan.  (Docket Entry # 90-12, pp. 33, 55-57).  For purposes of defendants' summary judgment motion, the record is construed in SSHC's favor.

Cave testified that they did not use the red tip.  (Docket Entry
# 90-8, p. 123).

After completing the power wash, another construction
worker (Steve Machnik) repointed "some of the loose and missing
mortar joints."  (Docket Entry # 90-8, pp. 128-129, 134).  Cave,
who personally observed Machnik perform the pointing, estimated
that Machnik repointed "maybe one percent of all the joints in
the building, less than one percent really."  (Docket Entry #
90-8, pp. 35, 129).  Cave also observed that "many of the areas
in the tower" showed that other people had worked on the area
using silicon to fill in missing mortar joints.  (Docket Entry #
90-12, pp. 140-141).  In addition, Cave determined that a
triangular wall above the altar showed that someone previously
put silicon in the mortar joints and, because there was already
silicon in the mortar joints, Machnik did not do any pointing in
that area.  (Docket Entry # 90-12, pp. 138-141).

Machnik used a Quickrete brand of mortar mix for the
repointing.  (Docket Entry ## 90-18, 90-19) (Docket Entry # 90-
12, pp. 33-35).  Instructions on the Quickrete bag set out a
series of steps consisting of cutting out and then raking excess
mortar, dampening the cleaned joints with a brush, loading "the
trowel with mortar," and then finishing the repaired joint to
match the existing joint and cleaning the excess mortar off the

brick.  (Docket Entry # 90-12, pp. 36-38) (Docket Entry # 90-19).  After the repointing, the construction workers applied a Comproco Shield MX waterproof sealer.[8]  (Docket Entry # 90-8, pp. 131, 134-135).

Overall, Cave performed and completed the work outlined in the contract using his own crew or subcontractors.  Cave hired Jim's Pro as a subcontractor to complete the plastering work at the Church.  (Docket Entry # 97, ¶ 6) (Docket Entry # 98, ¶ 6).  Cave testified that he "hires experts," manages their time and lets them "take care of the work."  (Docket Entry # 90-8, pp. 47-48).  There was no single written document setting out the contract between Cave and Artech.[9]  (Docket Entry # 94, ¶ 5) (Docket Entry # 102, ¶ 5).  There were, however, several writings between Artech and Cave, including proposals regarding the scope and cost of Cave's work, a June 23, 2009 invoice Cave sent to Artech and a number of other invoices or purchase orders.  (Docket Entry ## 94-4, 102-1, 102-3, 102-9) (Docket Entry # 90-8, pp. 21-24, 104-109).

In the fall of 2009 Peter Bourikas ("Bourikas"), chairman of the board of stewards' building committee, compiled a "punch

---

[8]  The exterior waterproofing category of the contract included a subcategory requiring Artech to coat the stone work "with Comproco Shield MX" sealer.  (Docket Entry # 90-5).

[9]  Defendants maintain an oral contract existed.  (Docket Entry # 102, ¶ 5).

list" of 20 items requested by the building committee.  (Docket Entry # 90-21).  Cave testified at his deposition that he had completed the remaining items on the punch list "probably sometime four days [sic] the beginning of October [2009], first week in October everything was completed."  (Docket Entry # 90-8, p. 241).  After Cave finished the punch list, Bourikas was satisfied with the work.  (Docket Entry # 115-1, p. 61).  Bourikas also stated that, if he had issues with the work, he drew Cave and Artech's attention to them "and they repaired them to [Bourikas'] satisfaction."  (Docket Entry # 115-1, p. 45).  He does not remember complaining about the mortar joints and agreed that he was "satisfied aesthetically with how [the reporting] was done."  (Docket Entry # 115-1, p. 49).  On October 6, 2009, the Church made the last installment payment after Cave completed the punch list.  (Docket Entry # 90, ¶ 21) (Docket Entry # 104, ¶ 21).

Lofgren attests that water leaks developed in the Church's exterior building in late February 2010, four and a half months after the restoration work was reported complete.[10]  (Docket

---

[10]  Defendants deny that the leaks started in February 2010 by noting that, "Panagia documents indicate the church suffered storm damage sometime prior to November 8, 2009."  (Docket Entry # 104, ¶ 30).  In particular, they identify minutes from a June 20, 2010 general assembly meeting of the Church which note, at most, that minutes from a November 8, 2009 general assembly meeting "were distributed and approved by the quorum."  (Docket

Entry # 90-1, ¶ 14).   The Church contacted its insurance company which sent a representative to inspect the damage on March 30, 2010.  (Docket Entry # 90-1, ¶ 15).  Bourikas recalled there "was a really bad wind and rainstorm" in the time frame preceding March 30, 2010.[11]  (Docket Entry # 115-1, p. 57).   The insurance representative observed lifted shingles on the roof above the altar.[12]  (Docket Entry # 90-26, p. 1).  Alongside a photograph of the roof above the Narthex, the representative noted, "No damage observed" and that "Wind blown water possibly entered through the vent and or the hatch door."  (Docket Entry # 90-26, p. 5).  The representative also noted water damage occurring to the ceiling and walls of the Narthex, a painted

---

Entry # 94-5, p. 2).   In a separate paragraph for "Committee Reports," the minutes from the June 20, 2010 general assembly meeting reflect that Lofgren reported on behalf of the building and grounds committee that, "The Church has suffered storm damage in places, especially over the Altar and Narthex" and that "[t]he insurance company has looked at the damage." (Docket Entry # 94-5, p. 2).  A representative of the insurance company took photographs on March 30, 2010.  (Docket Entry # 90-26).

[11]  Bourikas described that, "you can get horizontal-driven rain that goes right through a wall or a window" in Cohasset and in Hull "because the force of the wind is so hard."  (Docket Entry # 115-1, p. 37).  With respect to the Church, Bourikas testified that, "The wind facing the east section . . . is unbelievable" and "like a freight train because of the topography."  (Docket Entry # 115-1, pp. 17-18).

[12]  The state of the roof immediately before and after Artech undertook the work is relevant to these proceedings.

mural in the apse above the altar and a wall in the altar area.
(Docket Entry # 90-26, pp. 8-13).

Lofgren testified that he met with Burns and another
individual in early 2010 shortly after the Church experienced
the water damage.  (Docket Entry # 115-2, pp. 47-48).  Lofgren
also testified that he must have telephoned Cave as well.
(Docket Entry # 115-2, p. 66).

Cave likewise testified that in the spring of 2010 he
received a telephone call from Lofgren.  (Docket Entry # 90-8,
pp. 242-44).  Shortly thereafter, Cave told Lofgren and Bourikas
that he would "'fix the ceiling in the [N]arthex and the wall in
the nave at no cost.'"  (Docket Entry # 90-8, p. 249).  There
was no activity on Cave's part between the spring of 2010 and
September 2010 regarding the leak situation.  (Docket Entry #
90, ¶ 35) (Docket Entry # 104, ¶ 35).  In September 2010,
Lofgren contacted Michael G. Foley ("Foley") who, after climbing
up onto the roof, identified "numerous masonry joints with
'missing mortar' and," upon inspecting the interior of the
Narthex, "'found water on the brick inside' a room above the
ceiling of the Narthex."  (Docket Entry # 90, ¶ 36) (Docket
Entry # 104, ¶ 36) (Docket Entry # 90-27, pp. 82-83).

On September 20, 2010, Lofgren contacted Burns by email
concerning the problems at the Church and the inability to get

15

"the response we need" from Cave.  (Docket Entry # 90-47)
(Docket Entry # 115-2, p. 79) (Docket Entry # 90, ¶ 37) (Docket
Entry # 104, ¶ 37).  The two spoke on the telephone about the
problems in the Narthex area and, in a September 20, 2010 reply
email, Burns stated he would get back to Lofgren.  (Docket Entry
# 90-47) (Docket Entry # 115-2, pp. 79-80).  In a follow-up
letter to Burns dated September 21, 2010, Lofgren advised Burns
that he had "been working with Mike Cave . . . in an effort to
deal with our water intrusion problems which have devastated the
Narthex area of the church interior after all the work"
[performed by] Artech."  (Docket Entry # 90-48).  Lofgren also
informed Burns in the letter that, "A major part of the
restoration process was to make the [C]hurch 'tight' on the
exterior to avoid the water intrusion" and that this was "not
properly done."  (Docket Entry # 90-48).  The letter asserted
that "both roof flashing and stone joint leaks" led to the water
intrusion.  The letter enclosed photographs illustrating the
exterior problems.  (Docket Entry # 90-48) (Docket Entry # 115-
2, p. 80).

    Burns visited the property on October 6, 2010 and observed
the damage to the Narthex area as well as the altar area.
(Docket Entry # 90-53, pp. 215-217) (Docket Entry # 90, ¶ 40)
(Docket Entry # 104, ¶ 40).  Lofgren also discussed the masonry

16

with Burns.  (Docket Entry # 115-2, p. 81).  During the meeting,
Lofgren showed Burns the damage and Burns said "he would be
anxious to take care of it."  (Docket Entry # 115-2, p. 81).

On November 1, 2010, Lofgren emailed Burns about his
concern regarding completing "the masonry work" and "that the
contract was not honored."  (Docket Entry # 90-50).  In a reply
email the same day, Burns informed Lofgren that, "Cave will be
at the [C]hurch Saturday morning to complete the masonry work."
(Docket Entry # 90-50).  According to Cave, "'there was a
consensus between'" Burns, Lofgren and himself that some masonry
work needed to be done.  (Docket Entry # 90, ¶ 42) (Docket Entry
# 104, ¶ 42).  Lofgren's November 1, 2010 email also advised
Burns that the Church had "hired a roofing company that will
complete the roof repairs the second week in November."  (Docket
Entry # 90-50).  Stephen Flynn of Flynn Roofing Company
("Flynn") submitted a proposal to Foley dated October 21, 2010.
(Docket Entry # 90-27, p. 42).  The proposal quoted a price of
$9,000 to repair certain areas of the roof.  Flynn performed the
repairs and the Church paid Foley $9,000 for Flynn's work.
(Docket Entry # 90-27, pp. 42, 105, 120-121) (Docket Entry # 9-
35).

On November 13, 2010, Cave went to the Church to perform
the repairs and repointing.  (Docket Entry # 90, ¶ 43) (Docket

17

Entry # 104, ¶ 43).   The work was not completed that day.
(Docket Entry # 90-12, p. 82) (Docket Entry # 90, ¶ 44) (Docket
Entry # 104, ¶ 44).   Cave acknowledged there were a few areas of
minor damage remaining and said he would come back and take care
of them in the spring of 2011.  (Docket Entry # 90-8, pp. 250-
252) (Docket Entry # 90, ¶ 45) (Docket Entry # 104, ¶ 45).   That
spring, Lofgren asked Cave to return to take care of the
pointing and spoke to him on the telephone.  (Docket Entry # 90,
¶ 46) (Docket Entry # 104, ¶ 46) (Docket Entry # 90-12, p. 84)
(Docket Entry # 115-2, p. 82).   Cave, however, did not return in
the spring and thereafter did not perform any additional masonry
work on the Church.  (Docket Entry # 90-12, pp. 81, 83) (Docket
Entry # 115-2, p. 82).   In an email to Burns dated March 25,
2011, Lofgren expressed his view that Cave did not have an
interest in returning to the Church to do the re-mortaring.
(Docket Entry # 90-51).

In an email to Burns dated March 29, 2011, Lofgren stated
that "[t]he roof work has been completed."  (Docket Entry # 90-
52).   In the email, Lofgren informed Burns that, "[T]he mortar
work on the roof needs to be completed" and asked Burns to hire
a local contractor.  (Docket Entry # 90-52).   Burns did not

respond to the email.[13]  (Docket Entry # 90, ¶ 51) (Docket Entry
# 104, ¶ 51).

On July 7, 2011, Foley provided Lofgren with a proposal to
"repoint all mortar joints." (Docket Entry # 9-29).  The
proposal set out a cost of $63,000 and reflected "a second
phase" for Flynn to remove flashing and roof shingles for "an
additional cost" of $36,000.  (Docket Entry # 9-29) (Docket
Entry # 115-2, pp. 83-84).

In 2012, more than two years after the October 2009
inspection and final payment, SSHC's expert witnesses visited
the Church to review the existing conditions and prepare
reports.  (Docket Entry # 90, ¶ 55) (Docket Entry # 104, ¶ 55).
The reports detail damage to the mortar joints and stone masonry
among other problems.  (Docket Entry # 90-56) (Docket Entry #
90-58).

Robert G. Wilkin ("Wilkin") of CSI Consulting Inc., one of
SSHC's two experts, opined that, "[T]he main source of the
leakage into the sanctuary of the church appears to be from
water penetrating the stone masonry through poorly pointed and
open mortar joints and cracks." (Docket Entry # 90-56, p. 4).
He opined that the most recent masonry work, i.e., the work

---

[13] To quote defendants' response:  "Defendant does not dispute
this fact, but neither does it admit to it."  (Docket Entry #
104, ¶ 51).

performed by Machnik and overseen by Cave, was "poorly done and not in accordance with industry standards." (Docket Entry # 90-56, p. 4). He additionally concluded that more than 50% of the mortar joints were "defective with failing or cracked mortar allowing water to penetrate through the face of the masonry entering in to wall system and reach[ing] the interior."[14] (Docket Entry # 90-56, p. 4). Similarly, Michael Teller ("Teller") of CSI Consulting Inc., SSHC's other expert, opined that, "The pointing was done incorrectly" and that "[p]rior to the pointing work, the joints were not cut and insufficient mortar was installed into the joints." (Docket Entry # 90-58, p. 9). Teller also found that, "The color, finish, and type of mortar was incorrect." (Docket Entry # 90-58, p. 9). Teller opined that the inadequate and improper pointing over the door under the tower and over the apse caused leaks into the building. (Docket Entry # 90-58, p. 9).

---

[14] By affidavit, Thomas Burns, Artech's president, attests that, "It was never communicated to Artech that Panagia" had an expectation that 50%, let alone 100%, of the exterior joints would be repointed as part of the contract. (Docket Entry # 97-3). Thomas Burns, who is familiar with Artech's "pricing and quoting of all Artech's prospective work," further stated that, if the Church had indicated such an expectation, then Artech would have used a large masonry subcontractor and the price of the contract would have been more than $212,000. (Docket Entry # 97-3).

In addition to the improper repointing, Wilkin opined that the high pressure water cleaning process exposed formerly sealed mortar joints that were never repointed. (Docket Entry # 90-56, p. 4). Teller similarly determined that, "The power washing removed older, but still performing, sealants that had been applied over mortar joints" and that leaks began after the removal of the sealants. (Docket Entry # 90-58, p. 9).

DISCUSSION

## I.  Standing

Defendants argue that SSHC lacks standing because it was not a party to the June 22, 2009 contract. Article III of the Constitution endows the judicial branch with the power to settle only "cases" or "controversies." U.S. CONST. art. III, § 2, cl. 1. As explained in the August 2014 Report and Recommendation, SSHC bears the burden to establish standing.[15] Blum v. Holder, 744 F.3d 790, 795 (1st Cir.) ("'"party invoking federal jurisdiction bears the burden of establishing" standing'") cert. denied, 135 S.Ct. 477 (2014). The inquiry entails "a familiar triad" of "injury, causation, and redressability." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). More specifically, it requires a "concrete and particularized injury,

---

[15] The law regarding standing set out in the prior Report and Recommendation has not materially changed and is reproduced here for ease of reference.

a causal connection between that injury and the wrongdoer's
conduct, and the likelihood that prevailing in the action will
rectify the injury in some way." United States v. $8,440,190.00
in U.S. Currency, 719 F.3d 49, 57 (1st Cir. 2013).  To satisfy
"the 'irreducible constitutional minimum of
standing,'" a "plaintiff must have suffered or be imminently
threatened with a concrete and particularized 'injury in fact'
that is fairly traceable to" the defendant and "likely to be
redressed by a favorable judicial decision." Lexmark
International, Inc. v. Static Control Components, Inc., 134
S.Ct. 1377, 1386 (2014) (quoting Lujan v. Defenders of Wildlife,
504 U.S. 555, 560 (1992)).

Standing also has "a prudential component." Gianfrancesco
v. Town of Wrentham, 712 F.3d 634, 637 (1st Cir. 2013); accord
Katz v. Pershing, LLC, 672 F.3d at 72.  These prudential
concerns "'require a plaintiff to show that his claim is
premised on his own legal rights (as opposed to those of a third
party), that his claim is not merely a generalized grievance,
and that it falls within the zone of interests protected by the
law invoked.'" Katz v. Pershing, LLC, 672 F.3d at 72 (quoting
Pagán v. Calderón, 448 F.3d 16, 27 (1st Cir. 2006)).

A corporation, including a religious corporation such as
SSHC, may adopt names other than its incorporated name.  See

Women's Mutual Benefit Society, St. Mary of Carmen, of Newton v. Catholic Society Feminine of Maria S.S. of Monte Carmelo, of Newton, 23 N.E.2d 886, 888 (Mass. 1939) ("[t]here is no statutory prohibition whereunder a corporation may not use a name other than its own apart from the matter of infringing upon another's right to use a name"); accord Minot v. Curtis, 7 Mass. 441, 443-444 (Mass. 1811).[16]  Further, a corporation may conduct business under a trade name and enter into contracts "if unaffected by fraud."  William Gilligan Co. v. Casey, 91 N.E. 124, 124-125 (Mass. 1910); Atlantic Microwave Corp. v. Whalen, 2011 WL 4463492, at *2 (Mass.App.Ct. Sept. 20, 2011) ("'corporation may assume or be known by different names, and contract accordingly, and that contracts so entered into will be valid and binding if unaffected by fraud'") (quoting William Gilligan Co. v. Casey, 91 N.E. at 124, in parenthetical).  The legal principle that SSHC may enter into contracts under a trade name, however, does not automatically mean that SSHC did so under the facts of this case.

---

[16]  In Minot, the plaintiff attended a Baptist church incorporated as the "Baptist Society in Brunswick" but was subject to a proportional share of the tax lodged against the parish by the "assessors of the Congregational parish in Brunswick."  Minot v. Curtis, 7 Mass. at 441.  In finding the plaintiff subject to the tax, the SJC determined that, "As to the fact of this parish having used several names in its public proceedings, we know not why corporations may not be known by several names . . .."  Id. at 444.

Turning to the contract, Lofgren made the contract in a representative capacity as an agent of at least one principal. He signed the contract as "Parish Council President" underneath the line reading, "Purchaser Representative: Panagia Greek Orthodox Church."  (Docket Entry # 90-5); see, e.g., Marshall v. Stratus Pharmaceuticals, Inc., 749 N.E.2d 698, 705 (Mass.App.Ct. 2001) (Keith Pyle's signature "'For: Stratus Pharmaceuticals, Inc., s/Keith Pyle, Title: President' . . . makes clear that Pyle was contracting on behalf of Stratus").  The circumstances thus involve an agent representing one or more principals and a dispute regarding which principal was the contracting party. See Lunn & Sweet Co. v. Wolfman, 167 N.E. 641, 645 (Mass. 1929). Defendants contend that Panagia Greek Orthodox Church is an entity separate and apart from SSHC and, as such, it is the contracting party based on the language in the contract and the failure to refer to SSHC in any of the related documents.  SSHC maintains that Panagia Greek Orthodox Church is another well known and recognized name for SSHC and that SSHC therefore entered into the contract with Artech.

Ordinarily, in "a case where the identity of one of two possible persons, each represented by the same agent," is disputed, the actual contracting party is "ascertained from all the circumstances."  Id.; see Interstate Litho Corp. v. Brown,

24

255 F.3d 19, 26 (1st Cir. 2001) ("any questions as to whether
Brown," as opposed to Integra Technical Services, "was indeed a
proper party to the purported contract with Interstate were
questions of fact for the jury").[17]  When asked about his
relationship to SSHC during his deposition, Bourikas responded,
"Who is South Shore Hellenic Church?"  (Docket Entry # 115-1, p.
15).  The contract and the prior drafts do not refer to SSHC.
Neither Lofgren nor Bourikas stated to Artech that he was acting
on behalf of SSHC.  In contrast, Lofgren stated in his affidavit
that, "SSHC is also well known in the community under its
adopted trade names, 'Nativity-Assumption of the Virgin Mary
Greek Orthodox Church,' 'Nativity of the Virgin Mary Greek
Orthodox Church,' 'Nativity of the Virgin Mary/Panagia,'
'Panagia Greek Orthodox Church,' and 'Panagia Church.'"  (Docket
Entry # 100-1, ¶ 8).  On balance and considering the entire
record, a reasonable jury could find that SSHC was well known in
the community as Panagia Greek Orthodox Church.

In addition, the language of the contract refers to the
"purchaser representative" as Panagia Greek Orthodox Church, a
commonly known reference to SSHC.  The subject matter of the

---

[17]  The First Circuit in Interstate cited Associates Discount
Corp. v. Haynes Garage, Inc., 24 N.E.2d 685, 687–88 (Mass.
1939), which cited Lunn & Sweet Co. v. Wolfman, 152 N.E. 893,
894–895 (Mass. 1926) ("Lunn I"), the first of the two decisions
by the SJC in the Lunn litigation.

contract was to repair the church building which SSHC owned.
(Docket Entry # 90-5) (Docket Entry # 100-1, ¶ 5).

Conversely, there is ample support to find that Panagia
Greek Orthodox Church, as opposed to SSHC, was the contracting
party.  First and foremost, the contract refers to Panagia Greek
Orthodox Church and does not refer to SSHC.  See, e.g., Atlantic
Microwave Corp. v. Whalen, 2011 WL 4463492, at *1-2 & n.4
(conflicting evidence at trial regarding whether AMC had right
to enforce contract warranted trial court's denial of motion for
directed verdict).

Accordingly, for purposes of standing, a genuine issue of
material fact exists as to whether SSHC was the principal that
contracted with Artech.  The summary judgment record allows a
reasonable finder of fact to conclude that SSHC, which owns the
building subject to the deficient repairs, is well known in the
community under the trade name Panagia Greek Orthodox Church and
personally suffered the harm or injury in fact.  Such findings
would, in turn, permit a finding that SSHC is the proper party
to enforce the contract.  The finder of fact should therefore
resolve the materially disputed issue of the identity of the
entity that contracted with Artech.  Summary judgment is not
warranted based on SSHC's lack of standing.  As an issue of
subject matter jurisdiction, however, defendants may raise the

issue of standing "'at any stage of the litigation,'" including
at trial or in a post-trial motion. Bishop v. Smith, 2014 WL
3537847, at *4 (10th Cir. July 18, 2014); see Lujan v. Defenders
of Wildlife, 504 U.S. at 561 (the plaintiff must support
standing "with the manner and degree of evidence required at the
successive stages of the litigation").

## II.  Real Party in Interest

Defendants next move for summary judgment by renewing their
argument in the motion to dismiss (Docket Entry # 33, pp. 13-14)
that Panagia Greek Orthodox Church is the only real party in
interest.  (Docket Entry # 95, pp. 1-2) (Docket Entry # 96, pp.
2-7).  Defendants previously argued that SSHC is not a party to
the contract and that Panagia Greek Orthodox Church is the only
entity or unincorporated association with contractual rights
sufficient to bring suit.  (Docket Entry # 33, p. 14).  Further,
defendants maintained that, because the citizenship of Panagia
Greek Orthodox Church "depends on the citizenship of all of its
members," SSHC fails to show complete diversity.  (Docket Entry
# 33, pp. 13-14).

Rule 17(a) instructs that, "An action must be prosecuted in
the name of the real party in interest."  Fed.R.Civ.P. 17(a).
As explained in the previous Report and Recommendation,[18] the

---

[18]  For ease of reference, the legal principles are repeated

function of the rule is "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed.R.Civ.P. 17(a), Advisory Committee Notes, 1966 Amendment; Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc., 620 F.2d 1, 4 (1st Cir. 1980). The effect of the rule "is that the action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right." 6A Charles Alan Wright et al. Federal Practice and Procedure § 1543 (3rd ed. 2010). A real party in interest is therefore "the person holding the substantive right sought to be enforced." Lopes v. JetSetDC, LLC, 2014 WL 775243, at *6 (D.D.C. Feb. 19, 2014). A party that does "not possess[] a right under substantive law is not the real party in interest with respect to that right and may not assert it." Farrell Constr. Co. v. Jefferson Parish, La., 896 F.2d 136, 140 (5th Cir. 1990). Where, as here, diversity jurisdiction applies, state law "determine[s] which party holds the substantive right." Id.; Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 407 F.3d 34, 49 (2nd Cir. 2005) (examining "state law to determine whether

here.

Stichting properly possesses the right of action that it asserts
in this case"); see 6A Charles Alan Wright et al. Federal
Practice and Procedure § 1564 (3rd ed. 2010) (if "organization
lacks capacity to litigate in the state courts, it also will be
barred from a federal forum in that state").

It is "well-established that a trade name can neither sue
nor be sued." Diesel Machinery, Inc. v. Manitowoc Crane Group,
777 F.Supp.2d 1198, 1213 (D.S.D. 2011) (collecting cases); see
Atlantic Microwave Corp. v. Whalen, 2011 WL 4463492, at *2
("evidence at trial was conflicting, and would have permitted
the jury to infer that AMC contracted with Whalen under its
trade name of CDES-AMD and, therefore, was the proper party to
bring this action"); see generally Fried v. Wellesley Mazda,
2010 WL 1139322 (Mass.Dist.App.Div. March 9, 2010) (dicta noting
that, "defendants first argue, and Fried concedes, that the
default judgment entered against Wellesley *Mazda* is void because
Wellesley Mazda is merely a trade name of Hometown Auto, not a
separate entity subject to suit"). Construing the record in
SSHC's favor, a finder of fact could conclude that Panagia Greek
Orthodox Church was a trade name for SSHC. (Docket Entry # 100-
1, ¶¶ 7-8). Furthermore, as explained in Roman numeral I, it is
a genuine issue of material fact as to whether SSHC or Panagia
Greek Orthodox Church is the party to the contract with Artech.

Accordingly, defendants are not entitled to summary judgment
based on the failure to name Panagia Greek Orthodox Church as
the real party in interest under Rule 17.  Because the issue
turns upon factual disputes, defendants may raise the issue of
the real party in interest at trial or through a post-trial
motion.[19]

III.  Chapter 93A

       SSHC moves for partial summary judgment on the chapter 93A
claim against defendants arguing that defendants materially
breached the express guarantee in the June 2009 contract.  One
of the focal points of SSHC's chapter 93A claim concerns the
contract's exterior waterproofing category in paragraph seven.
In paragraph seven, Artech promised to perform exterior
waterproofing consisting of four items for a cost of $16,900.
According to SSHC, Artech failed to perform the second item
(exterior power washing) and the third item (repointing all
loose and missing mortar joints) in a workmanlike manner in
breach of the express warranty thus giving rise to chapter 93A
liability under section nine.  Defendants oppose the motion for
a number of reasons, including that SSHC is not a consumer with

---

[19]  A failure to raise the issue may constitute a waiver of the
issue.

a section nine claim but, rather, is engaged in trade or commerce.  (Docket Entry # 103).

Defendants also move for summary judgment on the chapter 93A claim.  First, they submit that the facts establish no more than a mere breach of contract that does not rise to the level of unfair or deceptive conduct.  Second, they contend that SSHC's failure to supplement "a 'state the basis' interrogatory" forecloses SSHC from relying on any new information to support the chapter 93A claim.  (Docket Entry # 96).  Third, they maintain that the facts do not constitute actionable fraud, misrepresentation or deceit that might form the basis of a chapter 93A claim.  Finally, they argue there is no viable chapter 93A claim against Burns as an individual.  SSHC opposes defendants' summary judgment motion based, in part, because it is a "consumer" not engaged in trade or commerce and therefore section nine rather than section 11 applies.  (Docket Entry # 99).  Defendants' reply memorandum asserts, inter alia, that SSHC is not a consumer entitled to bring a chapter 93A claim under section nine.  (Docket Entry # 113).

The viability of the chapter 93A claim and the merits of both summary judgment motions with respect to the chapter 93A claim therefore depends on whether section nine or 11 applies. Accordingly, this court initially examines whether SSHC is

31

eligible to bring a claim under section nine.  This court will then consider whether summary judgment in favor of either defendants or SSHC on the chapter 93A claim is appropriate.

A.   Applicability of Section Nine or 11.

In opposing defendants' summary judgment motion, SSHC identifies the following chapter 93A violations by Artech and Burns in addition to the breach of the express guarantee:  "(1) breach of implied warranty to do a workmanlike job; (2) negligence; (3) false advertising; (4) deceptive advertising of guarantees; and, (5) general misrepresentations."  (Docket Entry # 99) (citing 940 C.M.R. 3.00).  Section 11 of chapter 93A provides relief for "[a]ny person who engages in the conduct of any trade or commerce" who suffers a loss of money or property as a result of the use "by another person who engages in any trade or commerce" of unfair deceptive acts or practices.  Mass. Gen. L. ch. 93A, § 11.  Under the terms of the statute, a section 11 plaintiff is therefore a person who, inter alia, "engages in the conduct of any trade or commerce."  Mass. Gen. L. ch. 93A, § 11.  Section nine, in contrast, provides relief for "[a]ny person[] other than a person entitled to bring action under section 11 of this chapter."[20]  See Mass. Gen. L. ch. 93A,

---

[20]  A "'[p]erson' shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity."  Mass.

§§ 9, 11.  Sections nine and 11 are therefore "mutually

exclusive." Kunelius v. Town of Stow, 588 F.3d 1, 16 (1st Cir.

2009) ("the private rights of action found in sections 9 and 11

are mutually exclusive").

That said, section two declares unlawful "unfair or

deceptive acts or practices *in the conduct of any trade or*

*commerce*." Mass. Gen. L. ch. 93A, § 2(a) (emphasis added).

Thus, sections nine and 11 impose liability on a defendant for

damages when the transaction "occurred in the conduct of 'any

trade or commerce.'" See Kunelius v. Town of Stow, 588 F.3d at

16 ("for a defendant to be liable under the statute for damages

. . ., the transaction at issue must have occurred in the

conduct of 'any trade or commerce,' *see* Mass. Gen. Laws ch. 93A,

§§ 9, 11,"); Lantner v. Carson, 373 N.E.2d 973, 977 (Mass. 1978)

(the terms in section two, "'unfair or deceptive acts or

practices in the conduct of any trade or commerce[,]' must be

read to apply to those acts or practices which are perpetrated

in a business context").  "An act occurs in trade or commerce if

it is 'perpetrated in a business context.'" Kim v. Soule, 2014

WL 2117385, at *2 (D.Mass. May 20, 2014) (quoting Lantner v.

Carson, 373 N.E.2d at 977); accord Kunelius v. Town of Stow, 588

F.3d at 16 (proscription in section two "of 'unfair or deceptive

---

Gen. L. ch. 93A, § 1.

acts or practices in the conduct of any trade or commerce' must be read to apply to those acts or practices which are perpetrated in a business context").

Unlike section nine, section 11 also examines whether *both* the defendant and the plaintiff are "engaged in trade or commerce." Kim v. Soule, 2014 WL 2117385, at *2; see Lantner v. Carson, 373 N.E.2d at 976 ("where § 9 affords a private remedy to the individual consumer . . ., an entirely different section, § 11, extends the same remedy to '(a)ny person who engages in the conduct of any trade or commerce'"); accord Linkage Corp. v. Trustees of Boston University, 679 N.E.2d 191, 206 (Mass. 1997) (sections two and 11 impose dual inquiry, first, whether interaction is commercial in nature and whether parties were both engaged in "'trade or commerce,' and therefore acting in a 'business context'"). In other words, "section 11 affords no relief to consumers and, conversely, section 9 affords no relief to persons engaged in trade or commerce." Continental Insurance Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000). As noted above, "'Trade or commerce' refers to transactions in a 'business context.'" Feeney v. Dell Inc., 908 N.E.2d 753, 770 (Mass. 2009).

Neither party seriously disputes that Artech was acting in a business context. Nor do defendants seriously contend that

chapter 93A does not apply by virtue of the language in section
two limiting the statute to "the conduct of any trade or
commerce," i.e., transactions perpetrated in the business
context.[21]  Moreover, Massachusetts courts often apply chapter
93A to similar transactions and allegedly unfair or deceptive
acts or practices in the conduct of any trade or commerce under
section 2(a).  See, e.g., Linthicum v. Archambault, 398 N.E.2d
482, 484 (Mass. 1979) (applying chapter 93A to a defendant who
"agreed to reshingle the roof" of a dwelling), overruled in part
on other grounds, Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,
640 N.E.2d 1101 (Mass. 1994); Giannasca v. Everett Aluminum,
Inc., 431 N.E.2d 596, 597 (Mass.App.Ct. 1982) (defendant, who
"agreed to perform various exterior work on the plaintiff's
house" such as replacing roof and re-covering house with siding,
liable under chapter 93A when leaks occurred in ceiling and
"siding began to fall apart").  Rather, defendants focus their
argument on the premise that SSHC is not a section nine consumer
plaintiff but, rather, is engaged in trade or commerce acting in
a business context.  In other words, the parties dispute whether
SSHC was engaged in trade or commerce and thus ineligible to
bring a section nine claim.  See Linkage Corp. v. Trustees of

---

[21]  Artech *does* dispute whether an unfair or deceptive acts or
practices took place.

Boston University, 679 N.E.2d at 207.  The inquiry is fact-specific in nature.  Id. at 209.

An entity's status as a charitable corporation is not, in and of itself, dispositive of the issue of whether it was engaged in trade or commerce and therefore acting in a business context.  See Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc., 498 N.E.2d 1044, 1051 (Mass. 1986).  Factors in determining whether a person was acting in a business context "include the nature of the transaction, the character of the parties and their activities, and whether the transaction was motivated by business or personal reasons."  All Seasons Services, Inc. v. Comm'r of Health and Hospitals of Boston, 620 N.E.2d 778, 779 (Mass. 1993).

Several Massachusetts cases are illustrative in determining whether or not section 11 applies.  In All Seasons, the defendant hospital, a charitable organization, publicly advertised an effort to solicit bids for the operation of vending machines and a canteen facility at the hospital.  All Seasons Services, Inc. v. Comm'r of Health and Hospitals of Boston, 620 N.E.2d at 779.  The hospital received three bids and awarded the contract to a bidder which agreed to pay $4,800 per month for the privileges.  Id.  One of the two companies who did not receive the contract sued the hospital under chapter 93A,

section 11, claiming that the hospital's bid evaluation process
was tainted.  Id.  The defendant moved for summary judgment,
claiming that, as a matter of law, it was not amenable to suit
under section 11.  Id.

The court found that the hospital was not a person engaged
in trade or commerce under section 11 because the hospital was
not acting in a business context.  See id. at 779.  A hospital
does not act in a business context when it solicits bids and
awards contracts for food and vending service.  See id.  While
these services may have turned a profit for the hospital, they
were incidental to the hospital's primary function of providing
medical services.  See id. at 780.  In making this
determination, the court considered factors including the nature
of the transaction, the character of the parties and their
activities, and whether the transaction was motivated by
business or personal reasons.  See id. at 779; see also Kunelius
v. Town of Stow, 588 F.3d at 18 (holding that a planned
purchase, renovation and resale of property was performed in
furtherance of the core mission of a trust tasked with
conservation of land); Brodsky v. New England Sch. of Law, 617
F.Supp.2d 1, 2, 7 (D.Mass. 2009) (law school's expulsion of
student following failing grades constituted activities in
furtherance of school's educational mission and thus not

37

undertaken in business context); Hubert v. Melrose-Wakefield
Hosp. Ass'n, 661 N.E.2d 1347, 1349-50 (Mass.App.Ct. 1996)
(hospital's purchase and renovation of land was not done in
business context because such activities were incidental to
hospital's primary function of providing medical services even
though such activities had potential to generate profit).

As previously noted, however, an entity's status as a
charitable corporation is not of itself dispositive of whether
it engaged in trade or commerce such that chapter 93A applies.
See Linkage Corp. v. Trustees of Boston University, 679 N.E.2d
at 207; Planned Parenthood Fed'n of Am., Inc. v. Problem
Pregnancy of Worcester, Inc., 498 N.E.2d at 1051.  Linkage is a
prominent example of when a charitable enterprise is engaged in
trade or commerce.  See Linkage Corp. v. Trustees of Boston
University, 679 N.E.2d at 207-08.  Linkage arose out of a
dispute in an agreement between Linkage, a corporation which
provided training programs targeted at data processing
professionals, and Boston University, a nonprofit university.
Id. at 195-96.  Linkage was hired as an independent contractor
and managed academic programs for credit and noncredit.  Id. at
197, 207.  After a successful implementation of the program, the
university terminated its contract and insisted that it was free

to hire Linkage's employees despite the express no-hire provision in the base agreement.  Id. at 195, 200.

Noting that the relationship did not involve anything that was purely incidental to the university's educational mission, such as a contract for non-educational services or equipment, the court found that the university was engaged in trade or commerce.  Id. at 207-08.  While Boston University's status required that it remain a nonprofit corporation, the agreement with Linkage provided a "'lucrative earnings potential.'"  Id. at 208.  "[A]n institution's business motivations, in combination with the nature of the transaction and the activities of the parties" may therefore "establish a 'business context'" such that chapter 93A will apply.  Id. at 209.  The university was thus engaged in trade or commerce because it was acting in a business context in contracting with Linkage.  See id.

Turning to the contract at issue in this litigation, a reasonable finder of fact could find that SSHC was not acting in a business context and therefore not engaged in trade or commerce.  See Kunelius v. Town of Stow, 588 F.3d at 18; Brodsky v. New England Sch. of Law, 617 F.Supp.2d at 2, 7; All Seasons Services, Inc. v. Comm'r of Health and Hospitals of Boston, 620 N.E.2d at 780.  Similarly to how providing confections in a

hospital was not performed in a business context, so too could the repair work to a church.  See All Seasons Services, Inc. v. Comm'r of Health and Hospitals of Boston, 620 N.E.2d at 780. Whereas both have the potential to generate a profit, a reasonable finder of fact could find that the Church's profit was only incidental to providing religious services.  See id. In this regard, a reasonable fact finder could find that section nine rather than section 11 applies to SSHC because it was not engaged in trade or commerce when it contracted for the repair work.  See id.

Conversely, a reasonable finder of fact could also determine that SSHC was acting in a business context and thus engaged in trade or commerce.  See Linkage Corp. v. Trustees of Boston University, 679 N.E.2d at 207-08.  In Linkage, Boston University was acting in a business context when it contracted with Linkage because it was motivated by a strong desire to obtain a lucrative profit from providing educational services. See id. at 208.  The university also terminated the contract by creating a pretext and engaged in additional competitive marketplace activity.  Similarly, a reasonable fact finder could find that the repair work to the Church was done in order to turn a profit by increasing the number of steward families paying dues with a more welcoming environment.  A reasonable

40

fact finder could also find that the Church sought to greatly expand the scope of the contract unjustifiably to encompass work that was never part of the original contract and use it as a strategy to force defendants to perform work well beyond the scope of the original contract.  See id.  Linkage's ability to add value to Boston University, a determining factor in the university contracting with Linkage, could be found analogous to Artech's ability to add value to the Church.  See id.

A genuine issue of material fact therefore exists as to whether SSHC was acting in a business context.  See id.; Hubert v. Melrose-Wakefield Hosp. Ass'n, 661 N.E.2d at 1349-50.  A reasonable finder of fact could find that SSHC contracted repair work in furtherance of its core mission to provide religious services and was thus not acting in a business context.  See Hubert v. Melrose-Wakefield Hosp. Ass'n, 661 N.E.2d at 1349-50; (Docket Entry # 107, p. 13).  Conversely, a reasonable finder of fact could find that SSHC contracting repair work was undertaken in order to increase revenue which, in combination with the Church's activities, thus constituted acting in a business context.  See Linkage Corp. v. Trustees of Boston University, 679 N.E.2d at 207.

For purposes of defendants' and SSHC's summary judgment motions and viewing the record in favor of the particular non-

movant, a genuine issue of material fact therefore exists as to whether section nine or section 11 applies.  Because a finder of fact could conclude that the more plaintiff favorable section nine standard applies, defendants must show that no reasonable finder of fact could find them liable under section nine in order to obtain summary judgment on the chapter 93A claim. Conversly, a finder of fact could conclude that the more defendant favorable section 11 standard applies and that chapter nine does not apply.  In opposing SSHC's summary judgment motion, defendants' argument that SSHC is not a consumer is therefore well founded because a fact finder could conclude that SSHC was engaged in trade or commerce.  SSHC seeks summary judgment solely on the section nine chapter 93A claim. Accordingly, in light of the foregoing disputed issue of material fact, SSHC is not entitled to summary judgment on the chapter 93A claim under section nine.[22]

B.  <u>Defendants' Liability under Section Nine</u>

Examining defendants' liability under section nine, chapter 93A "proscribes 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

---

[22]  SSHC's remaining arguments relative to seeking summary judgment under its section nine chapter 93A claim therefore need not be addressed.  The amended complaint pleads only a violation of section nine.

commerce.'"  Juárez v. Select Portfolio Servicing, Inc., 708
F.3d 269, 280 (1st Cir. 2013) (quoting chapter 93A, section 2).
"'A practice is unfair if it is within the penumbra of some
common-law, statutory, or other established concept of
unfairness; is immoral, unethical, oppressive, or unscrupulous;
and causes substantial injury.'"  Young v. Wells Fargo Bank,
N.A., 717 F.3d 224, 240 (1st Cir. 2013) (addressing liability
under section nine and quoting Linkage Corp. v. Trustees of
Boston University, 679 N.E.2d at 209).  A practice is deceptive
"'if it "could reasonably be found to have caused a person to
act differently from the way he or she otherwise would have
acted."'"  Aspinall v. Philip Morris Companies, Inc., 813 N.E.2d
476, 486 (Mass. 2004) (discussing liability under section nine)
(brackets omitted).  A successful section nine claim "requires,
at a minimum, a showing of (1) a deceptive act or practice on
the part of the seller; (2) an injury or loss suffered by the
consumer; and (3) a causal connection between the seller's
deceptive act or practice and the consumer's injury." Casavant
v. Norwegian Cruise Line, Ltd., 919 N.E.2d 165, 168-69
(Mass.App.Ct. 2009).  "'Although whether a particular set of
acts, in their factual setting, is unfair or deceptive is a
question of fact, the boundaries of what may qualify for
consideration as a Chapter 93A violation is a question of law.'"

LimoLiner, Inc. v. Dattco, Inc., 2014 WL 4823877, at *7 (D.Mass.
Sept. 24, 2014) (internal citations omitted).

Defendants are correct that a mere breach of contract does
not warrant chapter 93A relief.  See Woods v. Wells Fargo Bank,
N.A., 733 F.3d 349, 358 (1st Cir. 2013) (addressing chapter 93A
claim under section nine).  Rather, the "facts must illustrate
something beyond a mere good faith dispute, failure to pay, or
simple breach of contract."  Id.; accord Juárez v. Select
Portfolio Servicing, Inc., 708 F.3d at 281.  For example, when
a party to a contract "employs a breach of contract to gain an
unfair advantage over the other, the breach 'has an extortionate
quality that gives it the rancid flavor of unfairness.'"  Arthur
D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir.
1998); accord Woods v. Wells Fargo Bank, N.A., 733 F.3d at 358
(internal citations omitted); Juárez v. Select Portfolio
Servicing, Inc., 708 F.3d at 281.  Likewise, "'conduct in
disregard of known contractual arrangements and intended to
secure benefits for the breaching party constitutes an unfair
act or practice for c. 93A purposes.'"  Ramos v. International
Fidelity Insurance Co., 34 N.E.3d 737, 741 (Mass.App.Ct. 2015)
(section nine, chapter 93A claim quoting Anthony's Pier Four,
Inc. v. HBC Associates, 583 N.E.2d 806, 821 (Mass. 1991)

(internal citation omitted), review denied, 34 N.E.3d 737
(2015).

Here, it is doubtful that defendants' ongoing failure to
rectify the defects identified by Lofgren and unfulfilled
promises to perform the repairs amounts to more than a mere
breach of contract.  That said, however, SSHC's chapter 93A
theories of recovery are not confined to a mere breach of the
June 2009 contract.  Rather, SSHC maintains inter alia that
defendants breached the express *guarantee* and the implied
*warranty* to do a workmanlike job.  (Docket Entry # 99, pp. 18-
22).

Regulation 3.08(2) of chapter 940 of the Code of
Massachusetts Regulations ("regulation 3.08(2)") provides that,
"It shall be an unfair and deceptive act or practice to fail to
perform or fulfill any promises or obligations arising under a
warranty.  The utilization of a deceptive warranty is unlawful."
940 C.M.R. 3.08(2); see also Knapp Shoes, Inc. v. Sylvania Shoe
Mfg. Corp., 640 N.E.2d at 1103 (noting "[b]y language in §2(c)
of G.L. c. 93A, the Attorney General is authorized to make rules
and regulations 'identify[ing] particular business practices as
falling within [the scope of §2(a)]'"); Casavant v. Norwegian
Cruise Line, Ltd., 919 N.E.2d at 169 (Mass.App.Ct. 2009)
(although chapter "93A does not define what acts and practices

are unfair or deceptive, § 2(c) of c. 93A specifically
authorizes the Attorney General to promulgate regulations making
these determinations"). A breach of warranty is not sufficient
grounds for liability under section 11 because regulation
3.08(2) was intended to protect consumers, not those engaged in
trade or commerce. See Knapp Shoes, Inc. v. Sylvania Shoe Mfg.
Corp., 640 N.E.2d at 1104. A breach of warranty is, however,
sufficient grounds to recover under section nine. See Maillet
v. ATF-Davidson Co., Inc., 552 N.E.2d 95, 98, 100 (Mass. 1990);
see also Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 640
N.E.2d at 1105 ("[t]he regulation, read as a whole, is rooted in
§ 9 of G.L. c. 93A."). Because section nine affords more
protection than section 11 and because an issue of fact remains
as to which section applies, defendants must therefore prove
that no reasonable fact finder could find that there was a
breach of warranty under section nine to be entitled to summary
judgment on the chapter 93A claim.

As stated in the express guarantee, "Artech Church
Interiors guarantees all workmanship for a period of one year
from the date of project completion." (Docket Entry # 90-5).
Regulation 3.01 provides that, "[A]ny verbal or written
representation, as well as any description of the goods, or
sample or model of the goods which is made part of the basis of

46

the bargain creates an express warranty."  940 C.M.R. 3.01.

Regulation 3.01 also clarifies that, "The terms 'warranty' or

'guarantee' . . . are synonymous."  940 C.M.R. 3.01.  Regulation

3.01 therefore encompasses the express representation

guaranteeing the workmanship for a one year period.

Exterior waterproofing, as outlined in the contract, is

subdivided into four categories.  The four subcategories for

exterior waterproofing included power washing and repairing all

loose and missing mortar joints.  In Republic Floors of New

England, Inc. v. Weston Racquet Club, Inc., 520 N.E.2d 160, 162

(Mass.App.Ct. 1988), a racquet club brought a breach of warranty

claim against a surface installation company.  The contract

included a provision that the installer would guarantee the

surface installation for a period of two years "with respect to

all workmanship and performance of the surface . . . against

such problems as debonding, delamination, separation, bubbles,

crazing, cracks, discoloration, and dead spots."  Id. at 163.

Within the period of the warranty, the racquet club noticed

bubbles, which persisted.  Id.  After the installer refused to

make repairs, the racquet club brought suit for breach of

warranty.  Id.  The court overturned a jury verdict because the

installer breached the express warranty guarantee by refusing to

fix the floor bubbling.  Id. at 164.  Here, at a minimum, the

47

facts allow a reasonable fact finder to find that defendants'
failure to repair and rectify the loose and missing mortar
breached the express guarantee.  It therefore remains a
genuinely disputed material fact as to whether defendants
breached the express warranty.  See Maillet v. ATF-Davidson Co.,
Inc., 552 N.E.2d at 98, 100; see also Knapp Shoes, Inc. v.
Sylvania Shoe Mfg. Corp., 640 N.E.2d at 1105; 940 C.M.R.
3.08(2).  Summary judgment in defendants' favor on the chapter
93A claim is therefore inappropriate.

C.  Local Rule 26.5

Relying on Local Rule 26.5(c)(8), defendants next seek to
preclude SSHC from using any newly produced information on
summary judgment or at trial that was not disclosed in response
to a state the basis interrogatory or a supplemental response
under Fed.R.Civ.P. 26(e) ("Rule 26(e)").[23]  Defendants further

---

[23]  Local Rule 26.5(c)(8) provides in relevant part:

(8) *State the Basis*. When an interrogatory calls upon a
party to "state the basis" of or for a particular claim,
assertion, allegation, or contention, the party shall
     (a) identify each and every document (and, where
     pertinent, the section, article, or subparagraph
     thereof), which forms any part of the source of the
     party's information regarding the alleged facts or
     legal conclusions referred to by the interrogatory;
     (b) identify each and every communication which forms
     any part of the source of the party's information
     regarding the alleged facts or legal conclusions
     referred to by the interrogatory;
     (c) state separately the acts or omissions to act on

submit that the amended complaint fails to set out any unfair or deceptive conduct in a non-conclusory manner.  (Docket Entry # 96, pp. 9-13).

In response to the state the basis interrogatory, SSHC stated that, "the Church refers to the bases described in the Amended Complaint."  (Docket Entry # 55-1, p. 4).  Furthermore, SSHC states in its general objections to the interrogatories that, "[p]ursuant to Fed. R. Civ. P. 33, Church incorporates into its answers hereto all information previously produced in automatic disclosure, dated March 31, 2013 and supplements thereto."  (Docket Entry # 55-1, p. 2).

The amended complaint, which SSHC identified in answering the state the basis interrogatory, references the defects in the exterior waterproofing category and its subcategories in the contract and defendants' repeated failures to correct such defects and perform corresponding requested repairs as unfair or deceptive acts or practices.

---

the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and
(d) state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

The body of the amended complaint and the chapter 93A
demand letter attached to the amended complaint include the
allegation that Artech breached the express provisions of the
contract by failing to waterproof the exterior of the Church.
They also disclose that Artech breached the express warranty by
failing to resolve the water intrusion in response to SSHC's
notification.  (Docket Entry # 9) (Docket Entry # 9-31).  The
amended complaint attached documentation that formed the basis
for these unfair or deceptive acts or practices, namely,
Wilkin's expert report.  (Docket Entry # 9-33).  The expert
report, in turn, elucidates the defective repointing and the
amended complaint quotes and highlight Wilkins' conclusions that
water penetrating the masonry through poorly pointed and open
masonry joints was likely the main source of the leakage.
(Docket Entry # 9, ¶ 57) (Docket Entry # 9-33).  Accordingly,
SSHC complied with Local Rule 26.5(c)(8).

Even if SSHC did not identify specific documents and
communications, the information that forms the basis to deny
defendants summary judgment was made known to them during
discovery.  SSHC has a duty to supplement incomplete or
incorrect information in the interrogatory answer "if the
additional or corrective information has *not otherwise been made*
*known to the other parties during the discovery process*."

50

Fed.R.Civ.P. 26(e)(1)(A) (emphasis added).  Any additional
information was made known to defendants during discovery.  For
example, Wilkins and Teller were deposed in June 2015 and
defendants' attorney attended both depositions.  (Docket Entry
## 90-55, 90-57).

In short, defendants' arguments that SSHC failed to provide
the information required under Local Rule 26.5 or that the
amended complaint fails to articulate any unfair or deceptive
conduct in a non-conclusory fashion are not well taken.
Accordingly, there is no basis to exclude newly produced
information from the summary judgment record.[24]

D.   Burns' Chapter 93A Liability

Defendants also move for summary judgment on the chapter
93A claim against Burns.  They maintain that SSHC failed to show
Burns' participation in the unlawful conduct or his knowledge of
the unlawful acts.  (Docket Entry # 96, pp. 16-19).  SSHC
asserts that Burns, as a corporate officer, is subject to
chapter 93A liability in light of his personal involvement with
the misconduct and deficient repair work.  (Docket Entry # 99,
pp. 14-15).

---

[24]  This court expresses no opinion on exclusion of newly
produced information at trial because this court is not the
trial court.

An officer of a corporation can be a proper defendant for purposes of a chapter 93A claim.  See Bolen v. Paragon Plastics, Inc., 754 F.Supp. 221, 228 (D.Mass. 1990).  Officers may be held liable under chapter 93A if they are acting within the scope of their authority.  See Standard Register Co. v. Bolton-Emerson, Inc., 649 N.E.2d 791 (Mass.Ct.App. 1995).  An individual's status as a corporate officer, however, is not in itself a sufficient basis for a successful chapter 93A claim against him. See Saveall v. Adams, 631 N.E.2d 561, 563 (Mass.App.Ct. 1994). Imposing liability on individual corporate officers requires either knowledge of unlawful acts or actual participation in acts made unlawful by chapter 93A.  See Nader v. Citron, 360 N.E.2d 870, 875 (Mass. 1977), rev'd on other grounds, Iannacchino v. Ford Motor Co., 888 N.E.2d 879 (Mass. 2008).

Further, corporate officers can be found liable under chapter 93A when their actions within their scope of employment are what give rise to those claims.  See Standard Register Co. v. Bolton-Emerson, Inc., 649 N.E.2d at 794-95.  In Standard Register, the defendant manufacturing company was asked to produce a label machine for the plaintiff company.  Id. at 792. The president and vice president of the manufacturing company, co-defendants in the litigation, assured the plaintiff that the label machine would be delivered by a date corresponding with

52

the plaintiff's move to a new production facility.  Id.  The

president and vice president knew that these representations

were false and continued to make representations even though

their manufacturing company was undergoing financial

difficulties that rendered construction of the label machine

impossible.  Id.  The president and vice president appealed a

judgment that held them personally liable claiming that they

should be shielded from liability because only their

manufacturing company was a party to the contract with the

plaintiff.  Id. at 793.  The court affirmed the judgment,

holding that the two officers were acting within the scope of

their authority as officers when they made misrepresentations in

violation of chapter 93A.  See id. at 794-95.  As explained in

Standard Register, when the actions of corporate officers are

what give rise to the chapter 93A claim, those officers can be

held personally liable for those actions.  See id.

    As previously noted, however, an individual's status as a

corporate officer is not in itself enough to create personal

liability when the corporation may be liable.  See Boyd v.

Camardo, 2003 WL 2004359, at *2 (1st Cir. May 2, 2003);[25] Saveall

---

[25]  This case, quoted at length in defendants' memorandum in
support of summary judgment, is unpublished.  Federal Rule of
Appellate Procedure 32.1(a) states that, "A court may not
prohibit or restrict the citation of federal judicial opinions
that have been designated as 'unpublished' . . . and issued on

v. Adams, 631 N.E.2d at 563.  In Boyd v. Camardo, the plaintiff
alleged that he was misled to believe that the defendant's
employer, EUW, was associated with Wurlitzer, a piano and
jukebox manufacturer.  Boyd v. Camardo, 2003 WL 2004359, at *1.
The plaintiff alleged that this misrepresentation stemmed from
EUW's statements in certain magazine advertisements.  Id.  The
court affirmed summary judgment in favor of the defendant,
noting that while the defendant held various positions at EUW,
including director, chief executive officer, and president, he
was not personally liable for the misrepresentation.  Id.  The
court held that there was no evidence that the defendant
participated in the creation or submission of the advertisements
that allegedly harmed the plaintiff.[26]  Id.

     Here, Burns exchanged multiple drafts of the contract with
Lofgren, the final of which included the express guarantee.
Cave, who performed or subcontracted the performance of the
work, testified that he reported to Burns while he was

---

or after January 1, 2007."  The advisory committee notes explain
that "the citation of unpublished opinions issued before January
1, 2007, will continue to be governed by the local rules of the
circuits."  Fed.R.App.P. 32.1, Advisory Committee Notes, 2006
Adoption, subdivision (a).  In the First Circuit, a court may
consider unpublished opinions "for their persuasive value but
not as binding precedent."  1st Cir. R. 32.1.0(a).  Although
considered for its persuasive value, Boyd is therefore not
binding precedent.
[26]  The plaintiff in Boyd did not allege a cause of action under
chapter 93A.

performing the Church renovations.  (Docket Entry # 90-8, pp. 69-70).  After the leaks began, Burns went back to visit the Church and allegedly failed to take remedial action in the spring.  Viewing the record in SSHC's favor, a fact finder could find that Burns' knowledge of the faulty construction work and/or his conduct in not responding to Lofgren's emails about the leaks or failing to take other requested remedial action gave rise, inter alia, to a breach of the express guarantee.  See Standard Register Co. v. Bolton-Emerson, Inc., 649 N.E.2d at 794-95.  Like the defendants in Standard Register and again viewing the record in SSHC's favor, a finder of fact could find that Burns' failure to provide the warranted services was done in the scope of his authority.  See id.  As explained previously, a reasonable fact finder could find that defendants' failure to repair and rectify the loose and missing mortar breached the express guarantee.  Overall, a fact finder could thus find Burns' personally liable.  See id.; see also Christian Book Distributors, Inc. v. Wallace, 760 N.E.2d 735, 736-38 (Mass.App.Ct. 2001) (affirming judgment finding corporation president personally liable because president was acting within the scope of his authority when he delivered false written representations to the plaintiff).  The decisions in the Boyd and Saveall cases relied upon by defendants are therefore

distinguishable because the defendant officers were not found personally liable because, unlike the circumstances here, they did not take part in the conduct giving rise to the chapter 93A claims against their corporations. See Boyd v. Camardo, 2003 WL 2004359, at *2; Saveall v. Adams, 631 N.E.2d at 563 (no liability of president or treasurer under chapter 93A where neither made misrepresentations). Accordingly, summary judgment on the chapter 93A claim against Burns is inappropriate.

IV.  Cave's Summary Judgment Motion

A.  Contribution

Cave moves for summary judgment on the contribution claim because SSHC's experts failed to establish that "the missing mortar was more likely a result of Cave's negligence" as opposed to other likely causes. (Docket Entry # 93). Cave notes that Wilkin identified rust imbedded in the steel tower walls contributed "'to the stone joint cracking.'" (Docket Entry # 93, p. 6). Defendants maintain that if Cave performed the work improperly and caused damage, then he is a joint tortfeasor responsible for his share of contribution. (Docket Entry # 101).

As summarized in the factual background, Wilkin opined that, "[T]he main source of the leakage into the sanctuary of the church appears to be from water penetrating the stone

masonry through poorly pointed and open mortar joints and cracks." (Docket Entry # 90-56, p. 4). Wilkin also opined, "with no hesitation," that the "work was also poorly done and not in accordance with industry standards." (Docket Entry # 90-56, p. 4). Wilkin's report also concludes that the recent repointing covered less than 1% of the joints and that an estimated 50% of the joints were defective thereby "allowing water to penetrate through the face of the masonry entering in to the wall system and reach[ing] the interior." (Docket Entry # 90-56, p. 4). Teller, as also set out in the factual background, rendered a similar opinion with respect to the incorrectly performed pointing.

With respect to the foundation for Wilkin's opinions, he conducted a visual inspection of the building along with Foley in May 2012. (Docket Entry # 90-55, pp. 33-34). He examined the masonry and, in light of the deterioration of the surface, cracking and sealant, posited that the sealant was approximately ten years old. (Docket Entry # 90-55, p. 39). His visual observations of the joints and repointing allowed him to conclude that certain repointing work appeared fresher or more recent than other repointing work and that the repointing work was not done correctly. (Docket Entry # 90-55, pp. 82-83). Overall, the report provides a basis for a reasonable fact

57

finder to conclude that the pointing by Machnik and overseen by Cave was poorly performed, covered less than 1% of the joints, and was not in accordance with industry standards; and that water penetrating the stone masonry through the poorly pointed and open mortar joints was the source of the water leaking into the Church less than five months after the completion of the work.  (Docket Entry # 90-56).

That said, as the facts elucidated by Cave (Docket Entry # 94, ¶¶ 19-24) illustrate, Wilkin's report notes the existence of rust in the structural steel in the tower walls as "contributing to the stone joint cracking."[27]  (Docket Entry # 90-56, p. 3). In addition, Wilkin testified at his deposition that it is "a good idea" to fix rusted steel before undertaking repointing. (Docket Entry # 90-55, pp. 45-46).

Cave also takes issue with Teller's opinion regarding power washing.  During his deposition, Teller acknowledged that he did not have first hand knowledge that sealants removed during the power washing were present before the power washing and were

---

[27]  Wilkin's report sets out 12 observations regarding his evaluation of the masonry before the section of the report captioned "Conclusions and Recommendations" in which he rendered his opinions.  The evaluation of the rusting in the steel beams is one of these 12 observations.  During his deposition, Wilkin characterized a statement in his report that "'rust formation is likely jacking the masonry up or contributing to the stone joint cracking'" as his opinion.  (Docket Entry # 90-55, p. 50).

acting as sealants.  His expert report nevertheless states that
the power washing "process removed loose mortar" and "aging
sealant" thereby exposing cracks and open joints that "allowed
moisture into the system to a much greater degree."  (Docket
Entry # 90-58, pp. 4-5) (Docket Entry # 90-57, pp. 94-100).
When asked if he had any information that the power washing was
done improperly, Teller testified that he did not have such
information and "was not there" to witness the washing.  (Docket
Entry # 90-57, pp. 94-95).  On the other hand, Teller explained
that he saw residue of "urethane caulking on the joints"
throughout the building and that "it appeared to have been
removed."  (Docket Entry # 90-57, p. 99).  He also visited the
property on three occasions in 2012, observed the masonry and,
on the second visit, accessed the roof.  (Docket Entry # 90-57,
pp. 60-63) (Docket Entry # 90-58, p. 1).  His visual inspection
of the building lead him to distinguish between the more recent
repointing based on its lighter color.  He also found "a lot of
loose and missing" mortar as well as cracked mortar that was
"installed incorrectly."  (Docket Entry # 90-57, pp. 80-81).
Teller's report further notes that he "saw photos of the
pressure washer used to clean the building."  (Docket Entry #
90-58, pp. 1-2).

In contrast to the visual inspections in 2012 by Wilkin and Teller, Machnik, who performed the actual repointing, testified that he used a joiner tool to finish repointing joints to "match the existing joints." (Docket Entry # 94-13). Bourikas testified that he could not "tell by looking at the church [the] new mortar versus [the] old mortar." (Docket Entry # 115-1, p. 49). He also testified that he did a final walkthrough after Cave completed the punch list in October 2009 and was satisfied with the work and the aesthetics. (Docket Entry # 115-1, pp. 17, 49). Finally, as previously noted, Bourikas described that Cohasset can experience horizontal driven rain and the wind is like a freight train.[28]

In light of these facts, Cave argues that defendants fail to demonstrate that Cave's conduct, including the allegedly poorly performed repointing of loose and missing mortar, was a result of Cave's work. Citing Alholm v. Town of Wareham, 358 N.E.2d 788, 791 (Mass. 1976), Cave maintains that defendants fail to show "a greater likelihood that their injuries were caused by a condition caused by the Defendant's negligence or breach of contract rather than by some other cause for which it is not liable."[29] (Docket Entry # 93). As explained in Alholm:

---

[28]  See footnote 11.
[29]  The Alhom case is the only legal authority Cave cites to present the argument.

> The plaintiffs had the burden of proving that the alleged nuisance or negligence was the proximate cause of their injuries. It was incumbent on the plaintiffs to demonstrate a greater likelihood that their injuries were caused by a nuisance maintained by the defendant town or by its negligence than by some other cause for which it was not liable.

Id.

Contribution claims arise when "two or more persons become jointly liable in tort for the same injury."  Mass. Gen. L. ch. 231B, § 1; LeBlanc v. Logan Hilton Joint Venture, 974 N.E.2d 34, 42 (Mass. 2012) ("'[w]ithout liability in tort there is no right of contribution'") (quoting Berube v. Northampton, 602 N.E.2d 560, 562 (Mass. 1992)).  "Under long-established Massachusetts law, causation in tort must be proved by a preponderance of the evidence."  Lynch v. Merrell-Nat'l Laboratories, Div. of Richardson-Merrell, Inc., 830 F.2d 1190, 1197 (1st Cir. 1987). On summary judgment, the defendant, i.e., Cave, therefore "wins if the plaintiffs fail to show 'that there was a greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause.'"  Id.; accord Alholm v. Town of Wareham, 358 N.E.2d at 791.

Considering the entire record, including the facts cited by Cave (Docket Entry # 94, ¶¶ 19-30), a reasonable fact finder could readily conclude that the defective repointing proximately

caused the water damage to the Church in early 2010.  More specifically, although the facts cited by Cave may weaken the opinions proffered by Wilkin and Teller, such opinions still provide a sufficient basis to conclude there is a greater likelihood that the poorly performed repointing and/or failure to repoint loose and missing mortar was caused by the water intrusion experienced by the Church in early 2010.

It is also well settled that experts can "express opinions based on facts about which they lack personal knowledge." Williams v. Illinois, 132 S.Ct. 2221, 2234 (2012).  Rule 702, Fed.R.Evid., requires that "opinion testimony rest on 'sufficient facts or data' and reflect the use of 'reliable principles and methods' appropriate to the expert's field." Crowe v. Marchand, 506 F.3d 13, 17 (1st Cir. 2007) (quoting Fed.R.Evid. 702).  Rule 703, Fed.R.Evid., allows an expert to base an opinion on inadmissible facts or data "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion."  Fed.R.Evid. 703.  Where, as here, "the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony-a question to be resolved by the jury."[30]  Int'l

---

[30]  This court expresses no opinion about the admissibility of either Wilkin's or Teller's opinion testimony at trial.  Rather, this court makes these findings solely to resolve the summary

<u>Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.</u>, 851
F.2d 540, 545 (1st Cir. 1988); <u>United States ex rel. Dyer v.
Raytheon Co.</u>, 2013 WL 5348571, at *9 (D.Mass. Sept. 23, 2013)
("disputes over the facts on which an expert bases his opinions
go to the weight of the testimony, not its admissibility")
(internal citation omitted).  Cave's arguments therefore do not
warrant summary judgment on the contribution claim in Count I of
the third party complaint.

B.   <u>Common Law Indemnity</u>

     In moving for summary judgment on the indemnity claim in
Count II of the third party complaint, Cave maintains that the
circumstances do not give rise to either implied or tort-based
indemnification.  (Docket Entry # 93, pp. 3-5).  Defendants rely
on both forms of indemnity as a basis for liability in Count II.
(Docket Entry # 101).

1.   <u>Implied Contractual Indemnity</u>

     Cave argues that the parties' relationship of a contractor
(Artech) and a subcontractor (Cave) lack the special factors or
relationship normally associated to imply contractual indemnity.
Artech and Burns submit that "Cave implicitly admits there was a
contract" between Artech and Cave and reason that a trial is

---

judgment motions.  It is the province of the trial judge to
assess and determine the admissibility at trial of any expert
opinion testimony.

therefore required to ascertain the content and scope of the contract.[31]   (Docket Entry # 101, p. 9) (bolding omitted).   The series of Cave's scope of work submissions to the Church, Cave's $87,700 invoice for the project as well the other invoices and/or purchase orders Cave submitted to Artech for the project evidencing the parties' course of performance provide an ample basis for a finder of fact to find the existence of an implied in fact contract between Cave and Artech.   Without citing any particular provision of the Artech/Cave contract, Artech and Burns quote portions of the amended complaint in the third party complaint that allege the deficiencies in the repair work by Cave, Jim's Pro, the construction crew and/or Machnik as well as Cave's statements to undertake repairs at no cost and make the Church "tight."   Artech and Burns also submit that Artech

---

[31]   To establish such a contract and its terms, defendants identify documents including:   draft contracts or quotes between Artech and Lofgren exchanged prior to the June 18, 2009 contract designating Cave as Artech's project manager; quotes by Cave directed to "Greek Panagia Parish" or Lofgren prior to the June 18, 2009 contract; an invoice dated June 23, 2009 for the restoration work from Cave to Artech; excerpts of Burns' deposition referring to purchase orders and payments as the contract between Cave and Artech; and the June 24, 2009 purchase order.   (Docket Entry ## 102-1 to 102-9) (Docket Entry # 102, ¶ 5) (Docket Entry # 94-4).   Cave also admits a number of allegations made in the third party complaint.   (Docket Entry # 53, ¶¶ 17(partial admission), 18, 20, 31, 32) (Docket Entry # 63, ¶¶ 17, 18, 20, 31, 32).   In addition to the June 23, 2009 invoice, Cave sent several additional invoices thereafter for the work he did to Artech, which it paid.   (Docket Entry # 90-8, pp. 21-24).

contracted with Cave for Cave to perform, execute and carry out all of the work on the project for the Church.   Based on the record, the terms of the contract are an issue of fact and a reasonable finder of fact could conclude that the Artech/Cave contract delegated all of the work to Cave with Artech retaining little, if any, control.

In Massachusetts, contractual indemnity may be express or implied.   See Fall River Housing Authority v. H.V. Collins Co., 604 N.E.2d 1310, 1312-13 (Mass. 1992); accord Decker v. Black and Decker Mfg. Co., 449 N.E.2d 641, 644-45 (Mass. 1983). Implied contractual indemnity arises from the *relationship* of the parties.   Fall River Housing Authority v. H.V. Collins Co., 604 N.E.2d at 1313 ("contractual right to indemnity arises from the relationship between the parties") (citing Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Authority, 693 F.2d 1, 2 (1st Cir. 1982)).   More specifically, implied contractual indemnity arises "only when there are 'special factors' surrounding the contractual relationship which indicate an intention by one party to indemnify another in a particular situation."   Id. (citing Decker v. Black and Decker Mfg. Co., 449 N.E.2d at 643-44, citing, as persuasive, Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth., 693 F.2d at 2-3).

As aptly pointed out by Cave, the *relationship* between a general contractor and a subcontractor ordinarily does not imply an obligation by the subcontrator to indemnify the general contractor for the latter's liability to the party to the original contract with the general contractor.  See Fall River Housing Authority v. H.V. Collins Co., 604 N.E.2d at 1313. Based on the summary judgment record for Cave's summary judgment motion, the parties' relationship as a general contractor and subcontractor under the Artech/Cave contract does not indicate an intention that Cave would indemnify Artech for damages arising from Cave's failure to perform the contract, making extra-contractual promises or guarantees to make the Church watertight, or any negligent performance of the contract.  In Fall River Housing, the general contractor relied on a provision in its contract with the subcontractor that an express indemnity provision did not "'reduce any other right or obligation of indemnity which would otherwise exist.'"  Id. at 1312.  The SJC, however, rejected the provision as too vague to evidence an intent by the subcontractor to indemnify the general contractor for the repair work.  Id. at 1313 (finding no basis to impose implied contractual indemnity based on the parties' relationship).  Fall River Housing set out a number of examples of "'special factors,'" none of which apply to the circumstances

66

in the case at bar.  See id. at 1313 (lessor's agreement to
repair implied obligation to indemnify lessee; town agreement to
provide police for fireworks implied obligation to indemnify
fireworks company); see also New Bedford Gas and Edison Light
Co. v. Maritime Terminal, Inc., 405 N.E.2d 653, 655 (Mass. 1980)
(finding "nothing in the relationship" of electric utility and
its customer "to warrant an implication of an obligation on
Maritime to indemnify Edison against Edison's loss" based on
tort action brought by Maritime's injured employee).  Here, as
in Fall River Housing, the relationship of the parties fails to
reflect any special factors indicating their intent that Cave
would indemnify Artech.

Artech and Burns' argument that Artech did not retain any
control over Cave's work and that Cave executed and completed
all of the work may provide a basis to impose tort-based
indemnity outside the context of personal injuries in a number
of other jurisdictions[32] and in the context of personal injuries
in Massachusetts.[33]  As the foregoing cases uniformly illustrate,

---

[32]  See SEI Investments Global Funds Services v. Citibank, N.A.,
100 F.Supp.3d 447, 455 (E.D.Pa. 2015); 17 Vista Fee Associates
v. Teachers Insurance and Annuity Association of America, 693
N.Y.S.2d 554, 558 (N.Y.App.Div.1st Dept. 1999).
[33]  See Ferreira v. Chrysler Group LLC, 13 N.E.3d 561, 567 (Mass.
2014); Decker v. Black and Decker Mfg. Co., 449 N.E.2d at 643-
644; Rathbun v. W. Massachusetts Electric Co., 479 N.E.2d 1383,
1385 (Mass. 1985).  Cave does not seek summary judgment on the
tort-based indemnity claim on the basis that it does not apply

however, implied contractual indemnity in Massachusetts is grounded on the parties' relationship as opposed to the derivative or constructive liability of defendants to SSHC for Cave's wrongful acts. See Greater Boston Cable Corp. v. White Mountain Cable Constr. Corp., 604 N.E.2d 1315, 1317 (Mass. 1992) (depicting "general rule for tort-based indemnity" as "'permitted only when one does not join in the negligent act but is exposed to derivative or vicarious liability for the wrongful act of another'"); see also Decker v. Black and Decker Mfg. Co., 449 N.E.2d at 644-45 (discussing indemnity for derivatively or constructively liable indemnitee separately from implied contractual indemnity); Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth., 693 F.2d at 2 (distinguishing between tort-based indemnity and express or implied contractual indemnity); Cumis Insurance Society Inc. v. BJ's Wholesale Club, Inc., 2005 WL 6075375, at *6 (Mass.Super. Dec. 7, 2005) (indemnity arises in three circumstances: "(1) an express agreement; (2) a contractual right implied from the nature of the relationship between the parties; and (3) a tort-based right where one party is held derivatively or vicariously liable for

---

outside the realm of personal injury tort actions. See Nicolaci v. Anapol, 387 F.3d 21, 27 (1st Cir. 2004). Notwithstanding the ability, see Fed.R.Civ.P. 56(f), this court declines to raise and address the issue sua sponte.

the wrongful act of another"). Simply stated, tort indemnification wherein a person "'does not join in the negligent act but is exposed to derivative or vicarious liability for the wrongful act of another' . . . exists independently of statute, and whether or not contractual relations exist between the parties." Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A., 479 N.E.2d 1386, 1388 (Mass. 1985).

As to implied contractual indemnity, Artech and Burns next assert that such indemnity is not subject to summary judgment because a trial is required to establish "what is in the contract and what is not." (Docket Entry # 101, p. 9). Artech and Burns, as the summary judgment targets and the third party plaintiffs bringing the indemnity claim, however, have the underlying burden to establish the elements of the claim at trial. See Hartford Casualty Insurance Co. v. Halliburton Co., 826 So.2d 1206, 1218 (Miss. 2001) (indemnitee plaintiff and non-movant on summary judgment had burden to offer evidence to withstand summary judgment); Triguero v. Consolidated Rail Corp., 932 F.2d 95, 101 (2nd Cir. 1991) (third party plaintiff seeking indemnity in LHWCA action failed to carry its burden to show relationship from which to imply indemnity); INA Insurance Co. of North America v. Valley Forge Insurance Co., 722 P.2d

975, 982 (Ariz.Ct.App. 1986) ("burden is on the party seeking [common law] indemnity to prove he is entitled to it"); Westinghouse Elec. Corp. v. Dade County, 472 So.2d 866, 867 (Fla.Dist.Ct.App. 1985) (burden on indemnitee to establish facts leading to recovery) (paraphrasing Crystal River Enterprises v. NASI, Inc., 399 So.2d 77, 79 (Fla.Dist.Ct.App. 1981)); Heritage Mutual Insurance Co. v. Stevens, 699 N.E.2d 1005, 1008 (Ohio Com.Pl. 1996) ("burden is on the party seeking [contractual] indemnity to prove that he or she is entitled to it").  In light of the foregoing authority, there is little reason to surmise that Massachusetts would not place the burden on Artech and Burns to establish the elements of their indemnity claim. Neither Artech nor Burns point to any provision of the contract evidencing an intent to impose an indemnity obligation on Cave or other evidence that their relationship was anything other than a normal and customary relationship of general contractor and subcontractor.  With Cave having pointed to the absence of evidence and as the summary judgment targets with the underlying burden at trial, it was incumbent upon Artech and Burns to point to such facts.  See Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 8 (1st Cir. 2015); Scottsdale Insurance Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009) ("party with the burden of proof must provide evidence sufficient for the court to hold that no

70

reasonable fact-finder could find other than in its favor").

For example, the June 23, 2009 invoice simply lists the items of

work Cave agreed to perform on the Church for specific fees

without any implicit or implied reference to an indemnity

obligation undertaken by Cave.  Summary judgment on the implied

contractual indemnity claim encompassed within Count II of the

third party complaint is therefore appropriate.

2.  Tort-Based Indemnity

    Citing the principle that tort-based indemnity requires

derivative or vicarious liability on the part of the party

seeking indemnification, Cave argues that this form of indemnity

does not apply because Artech's liability was neither

constructive nor vicarious.  (Docket Entry # 93, pp. 3-4).  Cave

additionally maintains that "Artech has an absolute defense if

it was not negligent with respect to the work performed by Cave"

and "is liable only if [SSHC] establishes Artech acted

negligently with respect to the church renovations."  (Docket

Entry # 93) (citing Decker v. Black and Decker Mfg. Co., 449

N.E.2d 641).[34]  Defendants submit that the absence of fault or

_____

[34] Decker was an action in which the plaintiff, an employee
injured in the course of his employment when operating a radial
arm saw, sued a manufacturer of the saw based on "negligent
manufacture, negligent failure to warn, and negligent failure to
correct defects" and a seller of the saw for "negligent failure
to inspect, negligent failure to warn, and breach of express and
implied warranties" under the Uniform Commercial Code,

71

negligence on their part as well as Cave's involvement and

Artech's retained control over the project are genuinely

disputed material issues of fact that preclude summary judgment

on the indemnity count.   (Docket Entry # 101).

    Tort-based indemnification "is permitted only when one

[prospective indemnitee] does not join in the negligent act but

---

Massachusetts General Laws chapter 106, sections 2-313 and 2-
314.  Id. at 642-643.  The manufacturer and the seller, as third
party plaintiffs, sued plaintiff's employer alleging the
latter's negligence and seeking indemnity.  Id. at 643.
Meanwhile, the employee did not reserve his common law rights
against his employer, Lenox Machine Company, Inc.  Id. at 642.
The relevant passage relied upon by Cave for the above
argument reads as follows:

> If either Black & Decker or Pittsfield is liable to the
> plaintiff, it will be as a result of its negligence or
> breach of warranty.  Such liability will not be derivative
> or vicarious in nature, nor will it be constructive rather
> than actual.  Accordingly, the third-party plaintiffs are
> not entitled to indemnification from Lenox.  If, as the
> third-party plaintiffs contend, the plaintiff's injuries
> were not caused by their negligence or breach of warranty,
> this will constitute an absolute defense to the main
> action.  Such a defense, however, does not provide the
> basis for an indemnity claim.  Sherman Concrete Pipe Mach.,
> Inc. v. Gadsden Concrete & Metal Pipe Co., 335 So.2d 125,
> 127 (Ala. 1976).  Robinson v. International Harvester Co.,
> 44 Ill.App.3d 439, 444-46, 3 Ill.Dec. 150, 358 N.E.2d 317
> (1976), rev'd on other grounds, 70 Ill.2d 47, 15 Ill.Dec.
> 850, 374 N.E.2d 458 (1977).  William H. Field Co. v. Nuroco
> Woodwork, Inc., 115 N.H. 632, 634, 348 A.2d 716 (1975).
>
> As in Liberty Mut. Ins. Co. v. Westerlind, 374 Mass. 524,
> 527, 373 N.E.2d 957 (1978), we base our decision on the
> statutory scheme embodied in G.L. c. 152.

Decker v. Black and Decker Manufacturing, 449 N.E.2d at 645.

is exposed to derivative or vicarious liability for the wrongful
act of another." Stewart v. Roy Brothers, 265 N.E.2d 357, 365
(Mass. 1970); accord Fireside Motors, Inc. v. Nissan Motor Corp.
in U.S.A., 479 N.E.2d at 1388; see Ferreira v. Chrysler Group
LLC, 13 N.E.3d at 567 (right to indemnity "limited to those
cases where the person seeking indemnification is blameless, but
is held derivatively or vicariously liable for the wrongful act
of another"). Here, a finder of fact could conclude that
defendants are liable based not on their own negligence but on
Cave's extra-contractual promises, negligent performance of the
repairs under the contract or breach of the express guarantee or
implied warranty in the contract. Further, their lack of
negligence vis-à-vis SSHC does not absolve them of liability to
SSHC for breach of contract. See Fireman's Fund Insurance Co.
v. Falco Construction Corp., 493 F.Supp.2d 143, 146 (D.Mass.
2007) (contracting party "'remains liable regardless of who
actually performs the contract obligation'") (internal citations
omitted). Thus, even if neither Artech nor Burns are negligent,
their lack of negligence does not constitute "an absolute
defense" in the main action, as argued by Cave. Decker is
distinguishable because there was no breach of contract claim in
the main action and the SJC grounded its "decision on the
statutory scheme embodied in G.L. c. 152." Decker v. Black and

Decker Mfg. Co., 449 N.E.2d at 645.[35]  Based on the arguments

presented, therefore, Count II is not subject to summary

judgment insofar as it raises a tort-based claim of indemnity.

C.   Breach of Contract and Breach of Implied Warranty

Cave next moves for summary judgment on the breach of

contract claim in Count III and the breach of the implied

warranty of claim in Count IV because they constitute negligence

as opposed to contract claims.  Citing Kingston Housing

Authority  v. Sandonato & Bogue, Inc., 577 N.E.2d 1, 3

(Mass.App.Ct. 1991), Cave reasons that, "the act of

unintentionally failing to conform with contract specifications

is not different from negligent workmanship."  (Docket Entry #

93, p. 9).  According to Cave, a "court must look at the 'gist

of the action' when determining the nature of a claim."  (Docket

Entry # 93, p. 9) (quoting Anthony's Pier Four, Inc. v. Crandall

Dry Dock Engineers, Inc., 489 N.E.2d 172, 175 (Mass. 1986)).

Both cases are distinguishable because they addressed an

issue different from the case at bar, namely, the applicability

of statutes of limitations or repose based on the classification

of a cause of action.  Thus, in making the above statement, the

court in Kingston was addressing whether to apply the three year

statute of limitations applicable to torts arising from

---

[35]  See the previous footnote.

improvement to real property, Mass. Gen. L. ch. 260, § 2B

("section 2B"), or a longer statute of limitations applicable to

contract claims, <u>see</u> Mass. Gen. L. ch. 260, § 2.[36]  <u>See</u> <u>Kingston</u>

<u>Housing Authority  v. Sandonato & Bogue, Inc.</u>, 577 N.E.2d at 3-

4.  The decision in <u>Anthony's Pier Four</u> is likewise

distinguishable because the court was determining whether

section 2B barred a breach of an express warranty claim.[37]  Cave

---

[36]  In full, the relevant portion of the opinion reads as
follows:

> Owners hoping to jump over the bar of G.L. c. 260, § 2B,
> observed that the statute was directed to actions of tort.
> They, therefore, attempted casting their claims in contract
> terms, i.e., breach of warranty, <u>see</u>, <u>e.g.</u>, <u>Klein v.</u>
> <u>Catalano</u>, 386 Mass. at 718, 437 N.E.2d 514, in hope of
> applying a longer statute of limitations.  That effort, as
> already noted, met with no success because the act of
> unintentionally failing to conform with contract
> specifications is not different from negligent workmanship.
> Unless breach of warranty in this context were read as just
> another label for negligent workmanship, the statute, which
> was curative in the sense that it sought to establish a
> special limitation for the litigation of construction
> disputes, would be nullified by the simple expedient of
> giving the action a different label.

<u>Kingston Housing Authority v. Sandonato & Bogue, Inc.</u>, 577
N.E.2d at 3.

[37]  Placing the quote in context, the relevant portion of the
decision reads as follows:

> A plaintiff may not, of course, escape the consequences of
> a statute of repose or statute of limitations on tort
> actions merely by labeling the claim as contractual. The
> court must look to the "gist of the action." <u>Hendrickson v.</u>
> <u>Sears</u>, 365 Mass. 83, 85, 310 N.E.2d 131 (1974). Thus, in
> <u>Klein</u>, supra, we held that § 2B would bar a breach of

fails to provide any other case or legal authority to support the argument.

More to the point, a "failure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made."  Anderson v. Fox Hill Village Homeowners Corp., 676 N.E.2d 821, 823 (Mass. 1997); accord Cumis Insurance Society, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 49 (Mass. 2009) ("failure to perform a contractual duty does not give rise to a tort claim for negligent misrepresentation"). As explained by the SJC in Anderson, tort obligations are:

> "imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction.  Therefore, if the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the only theory upon which liability would be imposed."

Anderson v. Fox Hill Village Homeowners Corp., 676 N.E.2d at 823-824 (quoting W. Prosser & W. Keeton, Torts § 92, at 656 (5th ed. 1984)).  The breach of contract and breach of implied

---

implied warranty claim where the elements for breach of implied warranty and for negligence claims are the same. Id., 386 Mass. at 719 & n. 19, 437 N.E.2d 514. A claim for breach of express warranty differs, however, from a negligence claim because the plaintiff must demonstrate that the defendant promised a specific result . . ..  We therefore conclude that § 2B does not apply to the plaintiff's express warranty claims.

Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 489 N.E.2d at 175.

warranty claims allege that Cave breached the contract between himself and Artech by failing to perform the work set out in the June 2009 contract between SSHC and Artech in a satisfactory or proper manner.  The obligations imposed are not independent of the Cave/Artech contract and the claims are therefore not subject to summary judgment because they constitute negligence claims.

D.  Breach of Covenant of Good Faith and Fair Dealing

Cave next moves for summary judgment on the breach of the covenant of good faith and fair dealing claim encompassed in Count III of the third party complaint.  In Count III, defendants assert both a breach of contract claim and a breach of the covenant of good faith and fair dealing claim.  Cave argues that defendants fail to show lack of good faith and "they have no reasonable expectation of presenting evidence satisfying the prima facie elements" of the claim.  (Docket Entry # 93). Defendants do not address the argument.

Massachusetts law implies a covenant of good faith and fair dealing into every contract.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009).  The covenant requires that the parties, in this instance Cave, not "'do anything which will have the effect of destroying or injuring the right of the other party,'" in this instance Artech, "'to receive the fruits

of the contract.'" Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000) (internal citations omitted); see Uno Restaurants Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004) (covenant "preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract"). "'The scope of the covenant is only as broad as the contract that governs the particular relationship.'" FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100 (internal citations omitted); Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007); see also Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005) ("concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives"). Hence, the covenant does not supply terms to contract between Cave and Artech "'that the parties were free to negotiate, but did not, nor does it "create rights and duties not otherwise provided" for in the contract.'" FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100 (internal citations omitted); Chokel v. Genzyme Corporation, 867 N.E.2d at 329 (same).

"The duty of good faith and fair dealing concerns the manner of performance" of the contract, Uno Restaurants Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d at 964, as opposed to the negotiation of its terms. Thus, when performing the

obligations of the contract, Cave must "'remain faithful to the intended and agreed expectations' of the contract." Chokel v. Genzyme Corp., 867 N.E.2d at 329.

There is, however, no requirement that the plaintiff show bad faith on the part of the breaching party. See Nile v. Nile, 734 N.E.2d at 1160 ("[t]here is no requirement that bad faith be shown"). Rather, "A plaintiff must show a lack of good faith," Uno Restaurants Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d at 964 n.5, which may be inferred by the evidence. See Nile v. Nile, 734 N.E.2d at 1160 ("showing of a lack of good faith is required in such circumstances, but it may be inferred by evidence"). Cave must therefore be honest in his dealings with Artech and "not purposefully injure" Artech's "right to obtain the benefit" of the contract. See Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925, 928 (Mass.App.Ct. 1993) ("duty of good faith would require that the bank be honest in its dealings . . . and that it not purposefully injure her right to obtain the benefits of the contract"); accord FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100 (quoting Shawmut Bank, N.A. v. Wayman, 606 N.E.2d at 928). The defendant's motives may bear on the determination of a lack of good faith. See T.W. Nickerson, Inc. v. Fleet Nat. Bank, 924 N.E.2d 696, 704 (Mass. 2010) ("we may look to the motive of the trustee in terminating the trust, as

that may be relevant to whether the trustee acted in good faith as to the plaintiff's rights under the leases"); see Restatement (Second) of Contracts § 205 cmt. d. (1981) ("willful rendering of imperfect performance" may violate obligation to perform contract in good faith).[38]  A breach of the covenant takes place "when one party violates the reasonable expectations of the other."  Chokel v. Genzyme Corp., 867 N.E.2d at 329 (internal citations omitted).

With Cave having identified the deficiencies in the claim, it was incumbent upon defendants, as the summary judgment targets with the underlying burden of proof on the covenant of good faith and fair dealing claim, to set out specific facts of Cave's lack of good faith.  See Ocasio-Hernández v. Fortuño-Burset, 777 F.3d at 8; Scottsdale Insurance Co. v. Torres, 561 F.3d at 77; T.W. Nickerson, Inc. v. Fleet Nat. Bank, 924 N.E.2d at 704 ("the plaintiff has the burden of proving a lack of good faith").  In the context of summary judgment, "a 'nonmovant may not rest upon . . . denials of the movant's pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial.'"  Bellone v. Southwick-

---

[38]  The SJC in Uno cites to section 205 in addressing a lack of good faith.  Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d at 964.

Tolland Regional School Dist., 748 F.3d 418, 424 (1st Cir. 2014)
(internal brackets and citations omitted).  Defendants do not
identify specific facts that they maintain evidence Cave's lack
of good faith, such as wilfully rendering a deficient
performance of the work outlined in the June 23, 2009 invoice.
In fact, defendants fail to even address the argument that there
is no evidence that Cave lacked good faith in performing the
Cave/Artech contract.  Thus, not only do defendants fail to
identify and set forth specific facts of a lack of good faith,
as required, they waived any argument that Cave acted with a
lack of good faith by not addressing it.  See Merrimon v. Unum
Life Ins. Co. of America, 758 F.3d 46, 57 (1st Cir. 2014), cert.
denied, 135 S.Ct. 1182 (2015) (if "party fails to assert a legal
reason why summary judgment should not be granted, that ground
is waived and cannot be considered or raised on appeal")
(internal quotation marks and citation omitted); Coons v.
Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010)
("district court was 'free to disregard' the state law argument
that was not developed in Coons's brief").  Cave is therefore
entitled to summary judgment on the breach of the covenant of
good faith and fair dealing claim in Count III of the third
party complaint.

E.   Lack of Privity

As a final argument, Cave maintains that Artech was the only intended beneficiary of the Cave/Artech contract and that Burns' lack of privity with respect to the Cave/Artech contract warrants summary judgment "as to all" of the claims brought by Burns.  (Docket Entry # 93) (bolding omitted).  Cave argues that, "In order for a third party to enforce a contract under Massachusetts law, '[i]t must appear from the language and circumstances of the contract that the parties to the contract clearly and definitely intended the beneficiaries to benefit from the promised performance.'"  (Docket Entry # 93, pp. 11-12) (quoting Paterson-Leitch Co. V. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 995 (1st Cir. 1988)).[39]  As framed by Cave, the privity and third party beneficiary argument pertains to Burns' ability to enforce an "agreement between Artech and Cave" (Docket Entry # 93, p. 12), i.e., the breach of contract claims as opposed to the tort claims.

---

[39]  Paterson-Leitch does not contain this language but the principle is an accurate statement of the law.  "Under Massachusetts law, in order for a third party to enforce a contract, '[i]t must appear from "the language and circumstances of the contract" that the parties to the contract "clear[ly] and definite[ly]" intended the beneficiaries to benefit from the promised performance.'"  Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 229 (1st Cir. 2005) (internal citations omitted).

Accordingly, even though Cave seeks summary judgment on "all claims," the argument does not apply to the *tort*-based indemnity claim in Count II.[40]  Similarly, the contribution claim in Count I does not require Burns' privity to the Cave/Artech agreement.  Contribution is derivative in nature and, "[w]ithout liability in tort," there is no right to contribution.  LeBlanc v. Logan Hilton Joint Venture, 974 N.E.2d at 42 (internal citations omitted).

In Count III, defendants allege that Cave did not "properly and completely" perform the Artech/Cave contract and thereby breached the contract.  (Docket Entry # 53, ¶¶ 52, 53).  With respect to Count IV, defendants allege that Cave breached an implied warranty in the Cave/Artech contract to perform the restoration work at the Church in conformity with the June 18, 2009 contract.[41]

---

[40]  The implied contractual indemnity claim is subject to summary judgment for reasons previously discussed.

[41]  The third party complaint alleges that Artech and Cave entered into a contract.  (Docket Entry # 53, ¶¶ 17, 52, 53). Paragraph 57 of the third party complaint, however, refers to Cave's agreement with Artech and Burns.  (Docket Entry # 53, ¶ 57).  Defendants do not argue that Burns was a party to the oral contract.  Rather, they maintain that Artech had an oral contract with Cave.  (Docket Entry # 102, ¶ 5 ("[w]hile true there was no written contract, a contract nonetheless existed between Cave and Artech, and there were writings between the parties, Cave and Artech that demonstrate existence of, at a minimum, an oral agreement or contract").

In Massachusetts, "a plaintiff seeking to enforce a contract as a third-party beneficiary must demonstrate 'from the language and circumstances of the contract that the parties to the contract clearly and definitely intended the beneficiaries to benefit from the promised performance.'" <u>Alicea v. Machete Music</u>, 744 F.3d 773, 784 (1st Cir. 2014) (internal citation omitted); <u>Pollak v. Federal Insurance Co.</u>, 2013 WL 6152335, at *3 (D.Mass. Nov. 21, 2013) (intent of "contracting parties is the central inquiry in determining whether a nonparty may maintain an action as a third-party beneficiary"). An incidental beneficiary lacks the ability to "enforce the terms of a contract." <u>Id.</u> at *4. Thus, ''to recover as a third-party beneficiary, the plaintiffs must show that they were intended beneficiaries of the contract.'' <u>Spinner v. Nutt</u>, 631 N.E.2d 542, 546 (Mass. 1994); <u>see</u> <u>Miller v. Mooney</u>, 725 N.E.2d 545, 549-550 (Mass. 2000) (third party beneficiaries must be "*intended* beneficiaries"). Massachusetts follows section 302 of <u>Restatement (Second) of Contracts</u> (1981) in ascertaining whether a person is an intended or incidental beneficiary.[42] <u>See</u> <u>Flattery</u>

---

[42] Section 302, captioned "Intended and Incidental Beneficiaries," reads as follows:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

v. Gregory, 489 N.E.2d 1257, 1261 (Mass. 1986); Markle v. HSBC

Mortg. Corp. (USA), 844 F.Supp.2d 172, 180 (D.Mass. 2011) (``both

Massachusetts law and federal common law follow the Restatement

(Second) of Contracts to assess the rights of third-party

beneficiaries''); see also Miller v. Mooney, 725 N.E.2d at 550

(citing Restatement (Second) of Contracts §§ 302, 315 (1981));

Alicea v. Machete Music, 744 F.3d at 784 (citing Restatement

(Second) of Contracts §§ 302, 315 (1981)).

A finder of fact could conclude that Artech and Cave had an

implied in fact contract under which Cave agreed to perform the

categories of work listed in the June 23, 2009 invoice.[43]  These

seven categories mirror the categories in the Artech/SSHC

contract.  Prior to June 2009, Cave submitted a proposal to

Artech on April 30, 2009, with prices for a number of categories

of work.  On May 13, 2009, he sent Artech another proposal with

---

        (a) the performance of the promise will satisfy an
        obligation of the promisee to pay money to the beneficiary;
        or
        (b) the circumstances indicate that the promisee intends to
        give the beneficiary the benefit of the promised
        performance.

        (2) An incidental beneficiary is a beneficiary who is not
        an intended beneficiary.

Restatement (Second) of Contracts § 302 (1981).

[43]  Under Massachusetts law, an implied in fact contract, which
defendants denote as an oral contract, "`requires the same
elements as an express contract and differs only in the method
of expressing mutual assent.'"  Katz v. Pershing, LLC, 672 F.3d
at 64, 74 (internal citation omitted).

revised costs that included a new category for exterior
waterproofing.  (Docket Entry # 90-8, pp. 107-110, 116-119).
Burns is an officer of Artech and signed the June 18, 2009
contract and its prior draft versions on behalf of Artech.  Cave
testified that he was a subcontractor for Artech and understood
that Burns and Thomas Burns owned the company.  (Docket Entry #
90-8, pp. 64-66, 158).  After June 18, 2009, Cave submitted
several additional invoices to Artech for his work, which Artech
paid.  (Docket Entry # 90-8, pp. 21-24).

There is little indication, however, that Artech and Cave
intended to confer third party beneficiary status on Burns.  He
is not named or identified in the invoice, which sets out the
categories of work and Cave's charges to perform the work for a
total of $87,700, or the prior proposals Cave sent to Artech.
See McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994) ("we are
unable to discern any indication in the Purchase Agreement that
the parties meant to make their respective agents or employees
third-party beneficiaries" inasmuch as they are not "mentioned
explicitly in the Purchase Agreement" and "there are no
meaningful categorical references") (applying New Hampshire
law); see also Evans v. Multicon Constr. Corp., 574 N.E.2d 395,
401 (Mass.App.Ct. 1991).  There is little, if any, evidence that
Artech or Cave intended to confer third party beneficiary status

86

on Burns.  Defendants do not point to any facts showing that

Burns, an officer of Artech, received a benefit such as direct

compensation or payment of a debt vis-à-vis Cave's performance.

Here again, defendants have the underlying burden of proof and

they fail to point to any facts indicative of Burns as a third

party beneficiary of the Cave/Artech contract.

Lacking either privity or third party beneficiary status,

Burns cannot maintain an action for breach of the Artech/Cave

contract or breach of the implied warranty purportedly

encompassed within that contract.  Cave is therefore entitled to

summary judgment on the breach of contract claim brought by

Burns in Count III and the breach of the implied warranty claim

brought by Burns in Count IV.

## V.   Defendants' Local Rule 56.1 Motion

As a final matter, defendants filed a motion seeking to

deem admitted 44 paragraphs in their statement of undisputed

facts because SSHC's responses were either unresponsive,

improper or not supported by citations to the record.  (Docket

Entry # 109).  Defendants argue that SSHC fails to admit or deny

19 paragraphs, improperly qualifies another 17 paragraphs and

fails to provide any citations to the record with respect to

eight paragraphs.  (Docket Entry ## 109, 110).

"'District courts enjoy broad latitude' in" administering
and enforcing local rules. NEPSK, Inc. v. Town of Houlton, 283
F.3d 1, 6 (1st Cir. 2002); United States v. Diaz-Villafane, 874
F.2d 43, 46 (1st Cir. 1989); see also Mariani-Colon v. Dept. of
Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 219 (1st Cir.
2007).  As an anti-ferret rule, Local Rule 56.1 functions to
focus a court's attention on the facts that are genuinely
disputed.  See Cabán Hernández v. Philip Morris USA, Inc., 486
F.3d 1, 7 (1st Cir. 2007) (anti-ferret "rules are designed to
function as a means of 'focusing a district court's attention on
what is—and what is not—genuinely controverted'"); accord
Mariani-Colón v. Dept. of Homeland Sec. ex rel. Chertoff, 511
F.3d at 219 ("purpose of this 'anti-ferret rule' is to require
the parties to focus the district court's attention on what is,
and what is not, genuinely controverted").  It is designed "to
reduce the burden on trial courts and prevent a party from
shifting the burden to the court to organize the evidence.  See
Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection
Technologies GMBH, 781 F.3d 510, 520-21 (1st Cir. 2015);
Zimmerman v. Puccio, 613 F.3d 60, 63 (1st Cir. 2010)
("reiterat[ing] the importance of" anti-ferreting rules as

88

"preventing litigants from shifting the burden of organizing

evidence to the district court").[44]

In pertinent part, the anti-ferreting rule in Massachusetts

requires the party opposing summary judgment to:

> include a concise statement of the material facts of record
> as to which it is contended that there exists a genuine
> issue to be tried, with page references to affidavits,
> depositions and other documentation . . ..  Material facts
> of record set forth in the statement required to be served
> by the moving party will be deemed for purposes of the
> motion to be *admitted* by the opposing parties *unless
> controverted* by the statement required to be served by
> opposing parties.

LR. 56.1 (emphasis added).

Citing and quoting Advanced Flexible Circuits, Inc. v. GE

Sensing & Inspection Technologies GMBH, 781 F.3d at 520-21,

defendants argue that SSHC should "admit" or "deny" each

paragraph.  (Docket Entry ## 109, 110).  A number of SSHC's

responses do not include these words and, instead, simply state,

"'Immaterial'" or "'Immaterial and inadmissable'" with a brief

explanation.  (Docket Entry # 98).  The language of the District

of Puerto Rico's local rule at issue in Advanced Flexible

mandates that the counter-statement "'shall admit, deny or

qualify the facts'" in the moving party's statement.   Id. at

520.  In comparison, Local Rule 56.1 requires the non-moving

---

[44]  Both Advanced Flexible and Zimmerman interpreted the District
of Puerto Rico's anti-ferreting rule.

party simply to controvert rather than "deny" or "admit" a

statement.  See also McGrath v. Tavares, 757 F.3d 20, 26 n.10

(1st Cir. 2014) (comparing the "solid anti-ferreting rules" in

the Districts of Maine and Puerto Rico to Local Rule 56.1),

cert. denied, 135 S.Ct. 1183 (2015).  SSHC's responses

adequately controvert defendants' statements.[45]  Furthermore,

mindful of the purpose for the rule, the violations, *if any*, did

not shift the burden to this court to organize the evidence.

     Defendants also argue that SSHC fails to cite to the record

with respect to a number of its responses.  Although it is not

always apparent whether the non-moving party complied with the

rule with respect to a particular statement, a party's omission

of citations to the record leaves no doubt about its violation

of the rule.  See Zimmerman v. Puccio, 613 F.3d at 63

("defendants' failure to provide any citations whatsoever in

their opposition statement leaves no doubt as to their

noncompliance"); see also Alsina-Ortiz v. Laboy, 400 F.3d 77, 80

(1st Cir. 2005) ("whether the rule has been violated is a

different question, easily answered where the opponent fails to

file any statement or omits all record citations but less so

---

[45]  Moreover, Local Rule 56.1 does not require SSHC to respond to
each paragraph, see id., and, like the plaintiff McGrath, SSHC
filed a statement of additional material facts in opposition to
defendants' summary judgment motion.  (Docket Entry # 100).

where the deficiency is of a different kind") (interpreting
District of Puerto Rico's local rule).  Notwithstanding SSHC's
failure to provide citations in response to certain statements,
a "district court may forgive a party's violation of a local
rule."  Mariani-Colón v. Dept. of Homeland Sec. ex rel.
Chertoff, 511 F.3d at 219.  Here, even though multiple responses
by SSHC do not include citations to the record, the purpose of
the rule is to avoid improperly shifting the burden to organize
the evidence to this court.  Given this court's familiarity with
this litigation, that burden was not shifted to this court or
compounded by SSHC's failure to include citations.[46]

Turning to the 44 paragraphs defendants identify to
complete the analysis,[47] paragraph one in defendants' statement
simply sets out a legal argument that SSHC is a stranger to the

---

[46] This court recognizes that cross summary judgment motions do
not affect SSHC's obligation to comply with Local Rule 56.1, see
Zimmerman v. Puccio, 613 F.3d at 63; but cf. McGrath v. Tavares,
757 F.3d at 26 n.10.  Accordingly, this court does not consider
SSHC's Local Rule 56.1 statement in support of its summary
judgment motion (Docket Entry # 90) as a response or as
otherwise satisfying its obligation to controvert defendants'
Local Rule 56.1 statement (Docket Entry # 97).  This court's
review of the 59 paragraph statement of undisputed facts with
citations (Docket Entry # 90), however, increased this court's
already existing familiarity with the litigation.  These
paragraphs include the findings of plaintiff's experts; the
terms of the June 18, 2009 contract; the work performed by
Machnik, Cave and his construction crew; and Burns' involvement.
[47] "[D]efendants have no objection" to two of the identified
paragraphs, namely, paragraphs 31 and 33.  (Docket Entry # 109,
pp. 17-18).  Accordingly, these paragraphs are not addressed.

contract as well as a description of the action set out in the amended complaint, namely, that this is a "state-law based, six count action alleging diversity of citizenship" and "breach of a contract to which it is a stranger, negligence and several related theories." (Docket Entry # 97). It does not set out a fact that is part of the summary judgment record. In any event, the procedural background includes these "facts" with the exception of SSHC being a stranger to the contract. SSHC's response also provides citations to specific paragraphs in its statement of disputed facts, which it incorporates into its opposition to defendants' summary judgment motions, and those paragraphs contain citations to documentation in the summary judgment record. In this court's discretion, the response is sufficient.

As to SSHC's response to paragraph two, defendants state they are entitled to have SSHC admit or deny the statement. To the contrary, Local Rule 56.1 requires the non-moving party to controvert the statement. SSHC's response states that the statement is "in dispute" and refers to its answer in paragraph one which, as noted above, is sufficient. SSHC's response to paragraph nine is also sufficient for similar reasons.

Paragraph three sets out a legal argument that "the named plaintiff in this action, SSHC, is not a party to the contract .

. . and it has not asserted rights as a third-party
beneficiary." (Docket Entry # 97). In addition, defendants do
not provide citations to the record for this legal argument. In
this court's discretion, paragraph three is not deemed admitted
as a fact. Moreover, SSHC's response, which refers to its
response to paragraph one, is sufficient. Paragraph five also
fails to include any citations to the record. In this court's
discretion, the fact is not admitted.

As to paragraph four, it is true that SSHC's counsel
described the Church as a "parish of roughly 90 stewards" at a
November 2013 status conference. (Docket Entry # 24-3, p. 3).
SSHC's response points out, correctly, that this court
previously declined to find the statement a clear and binding
judicial admission. (Docket Entry # 50, p. 21) (Docket Entry #
33, p. 2). Even considering the statement as an admission,
however, sufficient countervailing facts in the summary judgment
record as to standing make the issue one for the finder of fact.

Paragraph six in defendants' statement of undisputed facts
is part of the facts and set out in the factual background. The
substance of paragraph seven is likewise set out in the factual
background. Similarly, paragraph eight, which simply notes that
SSHC "complains of ongoing water leaks and damage to the church
building," is contained in the factual background. Plaintiff's

responses reflect that the statements in these paragraphs are undisputed.  Exercising this court's discretion, the failure to cite to the record in violation of Local Rule 56-1 is excused.

As to paragraph ten, SSHC states it is undisputed.  The fact that SSHC adds that the information is "immaterial" does not detract from its acknowledgment that the paragraph is undisputed and therefore not controverted.  In addition, this court recognized that neither the contracting documents nor the exhibits attached to the amended complaint reference "South Shore Hellenic Church, Inc." in determining SSHC's standing. The same reasoning applies to SSHC's answer to paragraph 11.

As to paragraph 12, the first sentence characterizes certain paragraphs in the amended complaint as "extensively based on the conduct of Cave in performing the contract." (Docket Entry # 97).  Paragraph 12 then quotes, at length, the paragraphs in the amended complaint.  SSHC responds with the answer, "Undisputed, but immaterial to the extent that defendants disclaim responsibility for Cave's acts."  (Docket Entry # 98) (emphasis omitted).  SSHC's response, which considered the "facts" undisputed and therefore not controverted, is sufficient.  The "facts," however, do not provide a basis to allow summary judgment in defendants' favor. The same reasoning applies to SSHC's response to paragraph 13.

Turning to paragraph 14, the substance of the cited portion of Cave's deposition in paragraph 14 is set out in the factual background. Furthermore, SSHC considered the paragraph "[u]ndisputed" and therefore not controverted. SSHC therefore complied with Local Rule 56.1 and its additional characterization of the information as "immaterial" does not detract from such compliance. The same reasoning applies to paragraph 15, which is contained in the factual background and constitutes an undisputed fact. Although considered by this court, the fact does not provide a basis to allow defendants summary judgment. Similarly, the facts in paragraphs 16 and 17, although undisputed, do not entitle defendants to summary judgment as to SSHC when considering the summary judgment record in its entirety.

SSHC's response to paragraph 19 is deficient. The paragraphs in the amended complaint cited in paragraph 19, however, do not necessarily support the statement that, "plaintiff claims it has leaks in the areas of the church in direct proximity to Foley & Flynn's work" in sealing and flashing the roof. (Docket Entry # 97). It is also worth noting that Teller opines that the "[l]eakage is not being caused by the roofing and flashing." (Docket Entry # 90-58, p. 9). Accordingly, defendants are not entitled to summary

judgment based on any admission of the "facts" in paragraph 19
based on any admissions in the cited paragraphs of the amended
complaint.

Paragraph 25 presents a legal argument as opposed to a fact
for purposes of summary judgment.  The legal argument is not a
fact that is admitted by virtue of SSHC's deficient response.
In this court's discretion, the paragraph is not admitted as an
uncontroverted fact for purposes of defendants' summary judgment
motion.[48]  The same reasoning applies to paragraph 26.  Paragraph
28 also presents a legal argument characterizing one of
Lofgren's affidavits as not providing "insight into the standing
dispute."  (Docket Entry # 97, ¶ 28).  In this court's
discretion, the paragraph is not considered an admitted fact.

Paragraph 27 states that an affidavit (Docket Entry # 24-2)
by Father Theodore Barbas, Chancellor of the Diocese of Boston
of the Greek Orthodox Church of America, uses the word "parish"
and, "as if deliberately not taking sides, never mentions" SSHC
or the Panagia Greek Orthodox Church.  (Docket Entry # 97, ¶
27).  SSHC admits that the affidavit uses the word "parish" but
submits that the latter statement is speculation.  This court
considered the affidavit in the course of recommending a denial

---

[48]  With respect to paragraph 25, defendants also fail to provide
any page references to the seven cited docket entries used to
support the argument.

of defendants' summary judgment motion.  Defendants'

characterization of Barbas' motivations is not considered an

admitted fact.

Paragraph 29 reproduces several statements made by SSHC's

counsel in a motion for a protective order (Docket Entry # 24)

and a motion to file a reply brief (Docket Entry # 29).[49]  A

statement in a brief may be treated as an "'admission' under

Rule 56." Cerqueira v. Cerqueira, 828 F.2d 863, 865 (1st Cir.

1987) (paraphrasing United States v. One Heckler-Koch Rifle, 629

F.2d 1250, 1253 (7th Cir. 1980)); 10A Charles Alan Wright et al.

Federal Practice and Procedure § 2723 (3rd ed. 2015) ("[a]lthough

some courts have stated that counsel's briefs (or allegations of

fact made by counsel during oral argument or in motion papers)

are not part of the record upon which the motion for summary

judgment is determined, these assertions are not entirely

accurate" inasmuch as "they are functionally equivalent to

_____

[49]  The paragraph, which sets out the statements, reads as
follows:

> Plaintiff has noted this is a "run-of-the-mill construction
> dispute", (Motion for Protective Order, Document 24, p. 7),
> a "garden variety construction case," id., p. 11, a
> "paradigmatic construction [] dispute, id. p. 11, and a
> "relatively straightforward construction contract dispute,"
> (Plaintiff's Motion for Leave to File a Reply, Document 29,
> p. 10).

(Docket Entry # 97, ¶ 29).

'admissions on file,' which are expressly mentioned in Rule 56(c)").[50]  That said, such statements must be clear and unambiguous to constitute judicial admissions.  See Lima v. Holder, 758 F.3d 72, 79 (1st Cir. 2014) ("'an admission of counsel during trial is binding on the client' if, *in context*, it is 'clear and unambiguous'") (emphasis added); Butler v. Deutsche Bank Trust Co. Americas, 748 F.3d 28, 39 (1st Cir. 2014) ("'[t]o be binding, a judicial admission must be clear'"). Here, even assuming for purposes of argument only that the statements are clear, they do not lead to summary judgment in defendants' favor on the chapter 93A claim.[51]  As explained above, this court expressed doubt but did not decide the issue of whether any breach of the contract was knowing and/or had the necessary extortionate quality to rise to the level of a chapter 93A violation.  See Woods v. Wells Fargo Bank, N.A., 733 F.3d at 358; Arthur D. Little, Inc. v. Dooyang Corporation, 147 F.3d at 55; Anthony's Pier Four, Inc. v. HBC Associates, 583 N.E.2d at 821; Ramos v. International Fidelity Insurance Co., 34 N.E.3d at 741.  Rather, this court decided the chapter 93A claim based on the trade or commerce issue.

---

[50]  Rule 56(c) now employs the term "admissions" as opposed to admission on file.

[51]  This court expresses no opinion on the admissibility of such statements at trial which is solely an issue for the trial judge.

Paragraph 30 simply quotes the amended complaint's quotation of portions of the chapter 93A letter.  As such, it is not a fact but, rather, sets out the basis for SSHC's chapter 93A claim and legal arguments.

Similarly, paragraph 31's recitation of the counts in the amended complaint is not a "fact" and, in any event, is included in the procedural background.  The same reasoning applies to paragraph 34.

Paragraph 32 sets out and quotes SSHC's answer to the state the basis interrogatory previously discussed.  SSHC's response states that it "dispute[s]" the paragraph because it does not set out SSHC's entire response to the interrogatory.  SSHC's response to paragraph 32 cites the amended complaint and, as discussed above, its answer to the interrogatory references the amended complaint.  SSHC therefore adequately complies with Local Rule 56.1 and, in any event, its response did not shift the burden to this court to organize the evidence.  Defendants' request as to paragraph 32 is therefore denied.

Paragraph 35 consists of a legal argument that SSHC does not allege "dishonesty or overreaching."  (Docket Entry # 97). In this court's discretion, it is not an admitted fact. Paragraph 36 similarly consists of a legal argument that SSHC fails to present evidence of Burns' personal involvement with

99

respect to the chapter 93A claim.  As a legal argument, it is
not an undisputed or admitted fact.  As explained above, the
argument did not warrant summary judgment in Burns' favor on the
chapter 93A claim given the *facts* in the summary judgment
record.  The paragraph also does not contain citations to the
record and, consequently, does not comply with Local Rule 56.1.
In this court's discretion, the request to admit paragraph 36 is
denied.  The same reasoning and ruling applies to paragraph 37.

The requests to admit paragraphs 44, 45, 50, 56 and 57 are
moot because the factual background sets out and includes the
deposition testimony and averments by affidavit reflected in
these paragraphs.  Alternatively, SSHC's responses did not shift
the burden to this court to organize the evidence or impose any
burden on this court.  In this court's discretion, the requests
are denied.  The paragraphs also do not mandate allowing
defendants' summary judgment motion.

As to paragraph 46, defendants seek to admit Lofgren's
testimony about what Foley told him about the "poor job" done on
the Church's roof by the prior roofing company.  (Docket Entry #
97, ¶ 46) (Docket Entry # 115-2, p. 31).  SSHC correctly
characterizes Lofgren's statements as hearsay.  In this court's
discretion, the request to consider the paragraph an admitted

fact is denied.  The same reasoning and ruling apply to paragraphs 47 and 48.

Paragraph 49 reproduces Thomas Burns' averment (Docket Entry # 97-3, ¶ 2).  The averment is part of the record with respect to defendants' summary judgment motion and the request to deem the paragraph an admitted fact is allowed to that extent.  The averment (Docket Entry # 97-3, ¶ 2), however, is not considered to directly contradict the parties' expressly stated and agreed price of $16,900 for the exterior waterproofing category, which encompassed the subcategory requiring Artech to repoint "[a]ll loose and missing mortar joints."[52]  (Docket Entry # 90-5).  As argued by SSHC, it is also not considered to show Thomas Burns' undisclosed intentions regarding the meaning of the contract.  See Farmers Insurance Exchange v. RNK, Inc., 632 F.3d 777, 787 n.9 (1st Cir. 2011) ("'contracts depend on objective manifestations of consent and not on uncommunicated subjective expectations'") (internal brackets and citations omitted).  The same reasoning and ruling applies to paragraph 51.

---

[52] This court expresses no opinion on the admissibility of any testimony by Thomas Burns similar to his averment.  (Docket Entry # 97-3, ¶ 2).  The ambiguity of the contract or the admissibility of extrinsic evidence to show the circumstances surrounding the contract are matters solely for the trial judge.

Turning to paragraph 52, the first sentence constitutes legal argument regarding the scope of the contract. The second sentence recites Thomas Burns' averment that Artech had no understanding or expectation that the Panagia Greek Orthodox Church had an expectation that 50%, "let alone 100%," of the mortar joints would be repointed. (Docket Entry # 97, ¶ 52) (Docket Entry # 97-3, ¶ 5). The third sentence, which is based on Thomas Burns' averment that it was never communicated to Artech that Panagia Greek Orthodox Church had an expectation that 50%, "let alone 100%," of the mortar joints would be repointed (Docket Entry # 97-3), is part of the record and included in the factual background. The contract states that, "All loose and missing mortar joints will be repointed." (Docket Entry # 90-5). The request as to the second and third sentences is moot because, even considering the second and third sentences as admitted facts, they do not result in a recommendation to allow defendants' summary judgment motion. In the alternative, SSHC's failure to cite to the record, even if it constitutes a violation, did not shift the burden to this court to organize the evidence or impose any additional burden on this court. Accordingly this court, in its discretion, forgives any violation.

Similarly, the requests as to paragraphs 53 and 54 are moot because, even considering the statements as admitted facts, they do not result in a recommendation to allow defendants' summary judgment motion.  In the alternative, SSHC's failure to cite to the record, even if it constitutes a violation, did not shift the burden to this court to organize the evidence or impose *any* additional burden on this court.  Accordingly, this court, in its discretion, forgives any violation.

As to paragraph 55, this court included and considered the fact that neither Lofgren nor Bourikas stated to Artech that he was acting on behalf of SSHC when addressing the standing issue. This court also recognized that the prior drafts of the contract and the contract do not refer to SSHC.  The request to consider the statement in paragraph 55 as an admitted fact is therefore moot.  In the alternative, SSHC's failure to cite to the record, even if it constitutes a violation, did not shift the burden to this court to organize the evidence or impose any burden on this court.  Accordingly, this court, in its discretion, forgives any violation of the rule.

Paragraph 58 seeks to establish that, "The contract . . . provided for, in a part labeled, 'Exterior Waterproofing' *solely* the following work: power washing the exterior, repointing '[a]all [sic] loose and missing mortar joints' and coating stone

103

work with a waterproof sealant." (Docket Entry # 97, ¶ 58) (emphasis added). The exterior waterproofing category and subcategories are set out in the factual background and part of the record. SSHC's response states that the paragraph is "in dispute" and cites to the contract (Docket Entry # 9-13) as containing a more complete and accurate statement of the category and subcategories. (Docket Entry # 98, ¶ 58) (emphasis omitted). SSHC therefore adequately complied with Local Rule 56.1.

Likewise, SSHC's response to paragraph 60 complied with Local Rule 56.1. SSHC stated that the statement was "in dispute," i.e., controverted, and provided citations to the record.

CONCLUSION

In accordance with the foregoing discussion, it is RECOMMENDED[53] that defendants' summary judgment motion (Docket Entry # 95) and SSHC's motion for summary judgment (Docket Entry # 91) be **DENIED**. The standing issue raises factual questions as

---

[53] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included. See Fed.R.Civ.P. 72(b). Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.

to whether SSHC was the contracting party.  It is also **RECOMMENDED**[54] that Cave's summary judgment motion (Docket Entry # 92) be:  (1) **ALLOWED** as to the implied contractual indemnity claim in Count II of the third party complaint, the good faith and fair dealing claim in Count III of the third party complaint, the breach of contract claim brought by Burns in Count III of the third party complaint, and Burns' claim in Count IV of the third party complaint; and (2) **DENIED** as to Count I of the third party complaint, Artech's claim in Count IV of the third party complaint, the tort-based indemnity claim in Count II of the third party complaint, and the breach of contract claim brought by Artech in Count III of the third party complaint.  The motion to deem SSHC's responses to defendants' Local Rule 56.1 statement admitted (Docket Entry # 109) is **DENIED** except to the limited extent set forth previously in Roman numeral V.


                 /s/ Marianne B. Bowler
                **MARIANNE B. BOWLER**
                United States Magistrate Judge

---

[54] See the previous footnote.